UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

STEPHANIE SMITH, *et al.*,           )
                                      )
        Plaintiffs,                   )        Civil Action No. 3:19-CV-721-CHB
                                      )
v.                                    )
                                      )        **MEMORANDUM OPINION**
RONALD R. TYLER, *et al.*,            )        **AND ORDER**
                                      )
        Defendants.                   )

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court on Defendant Johnathan Hall's Motion for Summary Judgment.[1]  [R. 107].  Plaintiffs Stephanie Smith, Bridgett Parson, and Cammie Musinski[2] responded [R. 108], and Hall replied [R. 109].  This matter is now ripe for consideration.  For the reasons that follow, the Court will grant Hall's Motion in part, deny the Motion in part, and permit further limited briefing.

## I.    BACKGROUND

### a.  Factual History

The events giving rise to this action occurred between 2016 and 2018 while the Plaintiffs were under the supervision of the Division of Probation and Parole within the Kentucky Department of Corrections ("KYDOC").  [R. 79, pp. 6, 18].  The Plaintiffs claim that, throughout this period, their assigned probation or parole officer, Ronald R. Tyler, subjected them to various

---

[1] Although at times spelled differently in the record, Defendant Hall states that his first name is spelled "Johnathan."  [*See* R. 18, p. 1 n.1].

[2] On November 12, 2020, the Plaintiffs filed a notice of death advising that Cammie Musinski died on October 31, 2020.  [R. 56; R. 56-1].  Pursuant to Federal Rule of Civil Procedure 25(a), Alayna Musinski, Administratrix of the Estate of Cammie Musinski, was substituted in place of Cammie in this action.  [*See* R. 84].  In the interest of clarity, any discussion of Musinski's claims refers to the Estate's claims.

forms of sexual harassment and abuse.  [*Id.* at 7].  For purposes of Hall's Motion for Summary Judgment, the Plaintiff's allegations of Tyler's sexual assault are undisputed.[3]  [R. 107-1, p. 2].

### 1.  Stephanie Smith

Smith was first placed under Tyler's supervision in June 2017 to serve a term of probation stemming from a May 2015 drug conviction.  [R. 88, pp. 28-29].  Tyler began making inappropriate comments toward Smith beginning with her first visit with him.  [*Id.* at 29].  In her words: "He talked about how pretty and sexy I was, how good I looked and asked if I was single." [*Id.* at 29, 56].[4]  During her second visit to Tyler's office, "he threw [her] against the wall and kissed [her] by force."  [*Id.* at 30, 56].  At some point Tyler began showing up at Smith's place of employment, staying for hours daily.  [*Id.* at 32, 56].

One day in September 2017, as Smith was leaving work, Tyler approached Smith and instructed her to drive to a parking lot next door to meet him and discuss approving Smith for unsupervised probation.  [*Id.* at 32-33].  Upon arrival at the parking lot, Tyler directed Smith to sit in the front passenger seat of his truck.  [*Id.* at 33].  Then, Tyler "unzipped his zipper and took out his penis and just pushed [Smith's] head down and had [her] do oral sex."  [*Id.*].

About a month later, Smith received a phone call from Tyler, who told her that he had reserved a hotel room and, "[Y]ou need to come here now."  [*Id.* at 35].  When Smith arrived at the hotel room, Tyler was naked, and his gun was placed on the television.  [*Id.* at 36-37].  Tyler raped Smith in the hotel room.  [*Id.* at 35].  Smith did not immediately report the sexual assaults

---

[3] In December 2021, Tyler pled guilty in state court to charges of tampering with physical evidence and official misconduct; sexual abuse charges against him were dismissed.  *See Commonwealth v Tyler*, No. 20-CR-00335 (Bullitt Circuit Court indictment filed Sept. 30, 2020).  Tyler is also facing federal charges arising from his sexual abuse of several people under his supervision. *United States v. Tyler*, No. 3:22-CR-066-CHB-RSE (W.D. Ky. indictment filed July 20, 2022).

[4] Smith's interrogatories were attached as an exhibit to her deposition testimony.  [*See* R. 88, pp. 55-65].

to law enforcement, explaining that at some point during their interaction, Tyler told her, "You are a drug addict.  Nobody is going to believe you.  Look at me.  I'm a police [sic].  Nobody's going to believe you and you will go back to jail."  [*Id.*].

Smith testified the rape was her last physical interaction with Tyler, yet he "texted off and on after that just to let [Smith] know he was still around and still here."  [*Id.* at 35-36].  Tyler also continued to threaten Smith, including coming into her new probation officer's office while she was there, "letting [Smith] know he was still around."  [*Id.* at 35].  Smith testified that Tyler made sure her new probation officer gave her a drug test because Tyler knew she had relapsed.  [*Id.* at 36].  Smith failed that drug test, and her probation was revoked.  [*Id.*].

According to Smith's testimony, Tyler continued to text her until she went to prison for her revocation.  [*Id.*].  The record is not clear as to when this occurred.  For example, Smith testified she went to jail "[p]robably a month-and-a-half after.  Maybe not even that long after the hotel."  [*Id.* at 24].  But she also testified that she served six months in prison and was released in January 2019, which would place the time she began to serve her sentence in July 2018.  [*See id.*].  Finally, her interrogatories suggest Tyler stopped texting her in February 2018.  [*See id.* at 57].  Under any of these dates, however, Smith's testimony indicates that, by July 2018, Tyler's abuse and harassment of her had ended.

While Smith was in prison, an investigator approached her because the investigator "had heard [Smith's] name mentioned on Ron Tyler."  [*Id.*].  Since then, Smith has cooperated with law enforcement in criminal investigations that have resulted in charges against Tyler.  [*Id.* at 8, 26, 37].  Smith was released from prison in January 2019, after which, she was supervised by a different officer.  [*Id.* at 24].  Smith testified that she was not supposed to be required to return to the Bullitt County Probation office, and when she reported there shortly after her release from

prison, she saw "Ron Tyler's name still on the door." [*Id.*]. This experience caused her to relapse and use drugs the same day. [*Id.*]. Smith confessed the relapse to her probation officer, which led to her being placed in drug treatment. [*Id.*].

### 2. Bridgett Parson

Parson was placed under Tyler's supervision in 2017 while she was on parole following her release from prison in 2014. [R. 89, p. 14]. Like Smith's experience, Tyler initiated discussions about Parson's personal life during her first visit with him that Parson viewed as inappropriate. [*Id.* at 15]. The behavior escalated from there. During her second visit, Parson observed that Tyler had pulled up her social media profile on his computer and "told [her] he loved [her] picture," [*id.* at 16], and as she was preparing to depart her third visit, Tyler kissed her on the cheek [*id.* at 17]. When she was leaving her fourth visit, Tyler kissed Parson on the mouth. [*Id.*]. The next time she saw Tyler, Parson told him that she did not feel comfortable with physical contact while he was her supervising parole officer. [*Id.*].

From then on, Tyler began pursuing Parson more aggressively. When she was in his office, he repeatedly "tr[ied] to stick his tongue down [her] throat" and "then it went to groping." [*Id.* at 18]. When she was outside of the office, Tyler would incessantly call her. In her view, "He just kept trying to get me to meet him out." [*Id.*]. Throughout this period, Parson continually rebuffed Tyler's advancements, telling him she was not comfortable with physical contact or social meetings with her parole officer. [*Id.*].

At some point, Tyler requested that Parson send him "some sexy pictures." [*Id.* at 22]. Parson said she sent the pictures, explaining: "I thought that if I just send him the pictures, he wouldn't -- he would pressure me to meet him out because he was really getting -- upset about me putting him off." [*Id.*]. Parson would eventually send ten to fifteen photographs of herself that

she described as inappropriate, including several nude photographs.  [*Id.* at 22-23].  During her deposition, Parson testified that at least one photo was sent to Tyler on October 8, 2018.  [*Id.* at 7].

Parson did not initially report Tyler's abuse to authorities:

> [T]here was no supervisor out there on that site and actually, I didn't know what was going on.  I was kind of in shock because he -- he never closed the door or tried to hide anything. So I didn't know what to think about it, actually.
>
> . . . I didn't want to make him mad.  I would make him mad and tried -- but I don't ask -- I didn't want to go back to prison -- I didn't want to go back to prison, I had a lot time and I just wanted to get through my parole and get it -- get -- and get it done.

[*Id.* at 22].  Concerning timing, Parson testified that the "big harassment stopped" about six months before Tyler was suspended, and her most recent unwelcome contact with Tyler occurred at the probation office around October 2018, "[r]ight before he got suspended."  [*Id.* at 24-25].

### 3.  Cammie Musinski[5]

Cammie was placed under Tyler's supervision in 2016 or 2017.  [R. 90, p. 10].  Late on January 5, 2018, Cammie contacted her daughter Alayna.  [*Id.* at 11, 17].  Alayna recalled: "She was a texter, so I saw that she said, 'emergency,' and usually, that's something serious.  She was saying that, sex with police."  [*Id.* at 11].  Alayna then called Cammie, who:

> said that it was a set up.  She said that he was supposed to have papers for her to sign, and it turned out to not be true, that he just wanted her to get in the car with him.  And they parked at a movie theater parking lot.  And then he -- she was threatened, saying that if she told anyone that he would make her drug test come back as positive and put her back in jail.

[*Id.*].

---

[5] The primary evidence concerning Cammie's abuse was offered in the record through deposition testimony of her daughter Alayna.  [*See* R. 90].  To avoid confusion in this section, the Court will use the first names of these women.

Cammie described the incident to Alayna as a violent sexual assault: "She said that it was against her will, that she did have bruises . . . that she told him to stop and that he was kind of wrestling with her a little bit." [*Id.* at 12]. Alayna told Cammie that "the best thing to do is to go get a rape kit and file a report." [*Id.* at 11]. Cammie later told Alayna that she had reported the assault to Tyler's manager,[6] and because "[h]e did nothing about it," Cammie filed a police report. [*Id.* at 12]. Cammie also told Alayna that a rape kit was administered following her police report. [*Id.*]. As far as Alayna knew, Cammie did not see Tyler again after the rape. [*Id.* at 12-13].

At some point after the assault, Cammie was contacted by the FBI, and she began cooperating with their investigation. [*Id.* at 12-14]. During the same period, Cammie retained counsel and brought this action. [*Id.* at 16]. Before the start of discovery in this case, Cammie tragically died from a drug overdose. [R. 75-1].

### 4. Johnathan Hall

During the events that give rise to this litigation, Hall was the Director of KYDOC's Division of Probation and Parole. [R. 87, p. 7]. In this role, Hall supervised around 400 probation and parole officers and directed their annual training. [*Id.* at 9]. He did not, however, directly supervise the officers. [*Id.* at 5]. For instance, Tyler's district supervisor was Trent VanMeter, who reported to Mark Stonex, who was supervised by Kirk Gausphol, who was in turn overseen by Hall. [*Id.*].

On March 25, 2019, Hall was "officially dismissed from duty" as Director. [*Id.* at 38-40]. According to Hall's termination letter,[7] he was dismissed based on his unsatisfactory performance

---

[6] Alayna did not know the name of this manager. [R. 90, p. 18].

[7] The Plaintiffs attached a redacted copy of Hall's termination letter as an exhibit to their initial Complaint. [*See* R. 1-2]. An unredacted copy of the letter is also attached as an exhibit to Hall's deposition. [*See* R. 87, pp. 38-40]. This Memorandum Opinion and Order will cite the unredacted version of the letter. [*See id.*].

of job duties (under 101 KAR 1:345, Section 1) and violation of CPP 3.22, Staff Sexual Offenses, and CPP 14.7, Sexual Abuse Prevention.  [*Id.* at 38].  The letter sets forth several instances in which Hall improperly handled allegations of sexual abuse involving Tyler.  [*See id.*].

First, the letter describes a case presented during a preliminary probable cause hearing in August 2018 regarding an offender ("S.K.") who absconded and who had been assigned to Tyler. [*Id.*].  According to the letter, during the hearing on August 30, 2018, the offender's counsel stated that his client had been sexually harassed and assaulted by Tyler.  [*Id.*].  The letter states that "[t]his was confirmed in a secret audio recording (date unknown) between Mr. Tyler and [S.K.] and in an affidavit signed on August 2, 2018 by [S.K.]."  [*Id.*].  The audio was played during the August 30, 2018 hearing.

According to the letter, S.K.'s counsel stated that his client had absconded for fear of being raped by Tyler and requested a transfer to a new probation and parole office.  [*Id.*].  The letter further states that Hall was advised of the hearing and of concerns about Tyler, and that when he was told, Hall became irate because he "had spoken with the attorney regarding the recording and he had agreed not to share the recording at [the offender's] hearing."  [*Id.* at 38-39].  Notably, the letter states that no documentation was found indicating that Hall requested an official investigation into S.K.'s claims.  [*Id.* at 39].

Second, the letter describes Probation and Parole Department PREA[8] Investigator Lisa-Marie VanNostrand's investigation regarding complaints against Tyler for sexual harassment of two female offenders.  [*Id.*].  Here, the letter states that, on approximately August 16, 2018, an offender ("J.C.") filed a sexual harassment complaint against Tyler with other probation and parole officers.  [*Id.*].  In September 2018, J.C.'s complaint was mentioned to VanNostrand, who had no

---

[8] Prison Rape Elimination Act.

knowledge of the complaint. [*Id.*]. VanNostrand followed up with Hall on September 28, 2018, regarding J.C.'s complaint, and Hall told her that he did not know about the complaint and that an investigation had not occurred. [*Id.*]. Later, VanNostrand was told Hall *was* aware of J.C.'s complaint.[9] [*Id.*].

Third, the letter describes Hall approaching the Human Resources Division Director at a Warden/Directors meeting on March 22, 2019. [*Id.*]. During that interaction, Hall told the HR director that a recent conversation involving another supervisee ("L.S.") reminded him of a phone call he had received from John Tilley,[10] then-Secretary of the Justice and Public Safety Cabinet, one night at midnight in 2018. [*Id.*]. Tilley told Hall about an attorney who had information about an officer sexually harassing his client. [*Id.*]. In March 2019, Hall told the HR director that the officer involved in that incident was Tyler, and that the phone call "had slipped [his] mind" because he was traveling the next day and forgot about it when he returned home. [*Id.* at 39-40].

The fourth allegation describes Hall as self-reporting his failure to act regarding L.S. [*Id.* at 40]. The letter quotes Hall as saying that he "dropped the ball" and was very concerned that he had failed to report an incident. [*Id.*]. According to the letter, Hall stated that he was leaving for Washington, D.C., the next day and that he failed to follow up on that incident report. [*Id.*]. The letter also cites Hall as saying that he was concerned his failure "may have led to others being victimized." [*Id.*].

---

[9] According to the letter, Tyler told VanNostrand that Gausphol had called him to ask about J.C.'s complaint; Gausphol later told VanNostrand that "he did make the call and [Hall was] aware of the complaint." [R. 87, p. 39]. Hall again told VanNostrand before her interview with Tyler on October 10, 2018, that he had no knowledge of J.C.'s complaint. [*Id.*]. On this allegation, the letter also states that "[n]o documentation was found that the conversation between Mr. Tyler and [Gausphol] took place or that an official investigation was conducted into the complaint filed by [J.C.]." [*Id.*].

[10] Tilley was arrested and charged under Kentucky law with first-degree rape in October 2022. *See Commonwealth v. Tilley*, No. 22-CR-00899 (Fayette Circuit Court indictment filed October 11, 2022).

The circumstances described in Hall's termination letter were fleshed out during his deposition. [*See, e.g.*, at 14].  For example, Hall testified that he first became aware of misconduct allegations involving Tyler on August 1, 2018, when he received a phone call from Secretary Tilley.  [*Id.*].  Tilley advised Hall that "he had received a phone call from Dan Goyette with Louisville [] Metro Public Defender's Office . . . [and] explained that Goyette had reported to him he had information regarding a sexual assault by a probation and parole officer."  [*Id.*].  Hall contacted Goyette, who identified the victim,[11] and assisted Goyette in rescheduling a hearing on the offender's parole that had been set for August 2, 2018.  [*Id.* at 14–15].  However, Hall did not act in response to the sexual assault allegation—indeed, he did not even inquire into which officer was involved—because, in his words, "I expected that I would be provided with the evidence and documentation that they said they had and was waiting to receive it."  [*Id.* at 15].

Hall's deposition testimony also discussed J.C.'s allegations against Tyler.  Here, Hall testified, that on August 16, 2018, J.C. reported to two female probation officers that Tyler had sexually harassed her.  [*Id.* at 14].  District Supervisor VanMeter wrote up a complaint documenting the allegation and forwarded the complaint to his supervisor who then forwarded the complaint to Hall and Hall's Assistant Director Gausphol.  [*Id.*].  However, Hall said that he "was out of the office at the time."  [*Id.*].  According to Hall, Gausphol "contacted the Justice Cabinet Internal Investigations Branch and asked them if they wish to open an investigation.  They responded they did not.  And that occurred on August 20, 2018."  [*Id.*].

During his deposition, Hall described other allegations against Tyler.  For example, he testified that, on September 19, 2018, "[t]he division received a complaint from a treatment center

---

[11] The record is confusing as to which offender this would have been.  For example, Hall's deposition testimony suggests that it was S.K. and that he "didn't reference any supervisee named [L.S.]" when he self-reported his failure to act.  [R. 87, p. 16].  However, the fourth allegation of the letter suggests a failure to report involving L.S.  [*Id.* at 40].

in Ohio indicating another victim had been sexually harassed by Mr. Tyler." [*Id.* at 17]. VanMeter received the complaint and reported it to PREA Investigator VanNostrand. [*Id.*]. VanNostrand then contacted Hall, and in his recollection, "I said there wasn't much substance to the complaint, but said she wanted to check into it a little bit further. I asked her to please do so, that -- see what information she could gather." [*Id.*]. VanNostrand proceeded to investigate the complaint.

Next, Hall testified that, in early October 2018, VanNostrand reported her findings to him, including that she identified several additional victims and that the complaints made against Tyler "seem[ed] credible." [*Id.*]. Hall testified, "at that point, I decided to place Mr. Tyler on administrative leave with pay pending the investigation. Investigator VanNostrand asked if I could wait until October 10 when she had the opportunity to investigate -- to interview Tyler in person. I agreed to do so." [*Id.*]. Hall gave VanNostrand a letter notifying Tyler of his placement on administrative leave, and VanNostrand gave Tyler the letter upon concluding his interview on October 10, 2018. [*Id.*]. Tyler's employment was officially terminated on January 15, 2019. [*Id.*].

Finally, Hall's deposition testimony addressed his self-report of a failure to act. On this point, Hall testified that, on March 22, 2019, he was told that the Justice and Public Safety Cabinet had made an inquiry into an allegation concerning Tyler. [*Id.* at 15]. Hall then "searched through all of the documents that [he] had for anything regarding Ron Tyler," and he found an August 2018 email from Goyette containing an affidavit. [*Id.*]. This prompted Hall to self-report his failure to act on an individual's complaint. [*Id.* at 15–16]. Notably, during his deposition, Hall stated: "And as one of many people involved in the entire scenario, I understood how serious it was to have sexual harassment allegations, and that anybody who plays a role in that, or potentially could have contributed, should be very concerned." [*Id.* at 16].

### b. Procedural History

The Plaintiffs filed their initial Complaint in this Court on October 7, 2019. [R. 1]. In addition to Hall and Tyler, the Complaint listed Phil McHargue (a supervising probation officer) and KYDOC as defendants. [*See id.*]. In November 2019, the claims against McHargue, KYDOC, and Hall in his official capacity were dismissed after the Plaintiffs filed a Notice of Dismissal. [*See* R. 10]. The Plaintiffs also settled their claims against Tyler in August 2022. [R. 112]. Thus, the Plaintiffs' only remaining claims are against Hall in his individual capacity.

In March 2021, the Court directed the Plaintiffs to "file an amended complaint clarifying" some of their claims. [*See* R. 77, p. 19 ("Plaintiffs SHALL file an amended complaint clarifying which of the claims in Count IV apply to which defendant within fourteen (14) days of the entry of this Order.")]. The Plaintiffs' Amended Complaint was filed on April 12, 2021. [R. 79]. However, their Amended Complaint remains a muddled mess. Indeed, despite new Plaintiffs' counsel's representations that they "would have filed a very different initial complaint" [R. 108, p. 3], when given the opportunity to do so, counsel filed the *exact same* complaint, even including claims that the Court had previously dismissed. [*See, e.g.*, R. 79 (listing claims against McHargue and KYDOC)]. The only alteration in the Amended Complaint appears in Count IV, where the Plaintiffs attempt to specify which tortious claims are asserted against Hall and which are asserted against Tyler. [*Id.* at 26–27].

Hall has now moved for summary judgment [R. 107], the Plaintiffs responded [R. 108], and Hall replied [R. 109]. Upon review, the Court observes that the briefing by both parties on Hall's dispositive motion leaves much to be desired; the parties, particularly the Plaintiffs, conflate their arguments regarding the remaining counts, cite little or no case law, and fail to include

appropriate references to the record.  In such a posture, the Court declines to parse through the record to divine claims that the Plaintiffs did not clearly plead and have not since argued.

Instead, the Court views the Plaintiffs as each having asserted four claims:  (1) a claim under 42 U.S.C. § 1983 based on Hall's alleged failure to train or supervise; (2) a § 1983 claim based on Hall's alleged failure to protect or enforce policy; (3) a Kentucky negligence claim based on Hall's alleged failure to train or supervise; and (4) a Kentucky negligence claim based on Hall's alleged failure to protect or enforce policy.  [*See generally* R. 79, p. 4 ("Plaintiffs bring this case seeking compensatory damages under 42 U.S.C. § 1983 and state law . . . stemming from . . . Hall['s] failure to screen, train, and/or supervise Defendant Tyler as well as [his] failure to take action when [he] knew or should have known of Defendant Tyler's sexual abuse.")].

As will be explained below, only Parson's federal and state law claims based upon Hall's purported failure to protect or enforce policy survive summary judgment.  However, the Court will permit further limited briefing on these claims to help ensure a clean record.

## II.   STANDARD OF REVIEW

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  When determining a motion for summary judgment, the Court must construe the evidence and draw all reasonable inferences from the underlying facts in favor of the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009).  The Court may not "weigh the evidence and determine the truth of the matter" at the summary judgment stage.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  The Court "need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).

The initial burden of establishing that no genuine dispute of material fact exists rests with the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies this burden, the burden then shifts to the nonmoving party to produce "specific facts" showing a "genuine issue" for trial. *Id.* at 324. When, as here, the defendant moves for summary judgment, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

Where "a party fails to support an assertion of fact or fails to properly address another party's assertion of fact," the Court may treat the fact as undisputed. Fed. R. Civ. P. 56(e)(2). A fact is "material" if the underlying substantive law identifies the fact as critical. *Anderson*, 477 U.S. at 248. Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* A "genuine" issue exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249.

## III.  ANALYSIS

As a preliminary matter, the Plaintiffs have conceded their intentional infliction of emotional distress and invasion of privacy claims. [R. 108, p. 3]. And other than federal and state claims based on Hall's alleged failure to train, supervise, protect, or enforce policy, the Plaintiffs have wholly failed to respond to Hall's Motion for Summary Judgment. Thus, the Court finds no genuine issues of material fact as to the Plaintiffs' other claims and will grant Hall's Motion for Summary Judgment on those claims.[12] *See* Fed. R. Civ. P. 56(e); *Everson v. Leis*, 556 F.3d 484,

---

[12] Previously, the Court described the Plaintiffs' counts as follows: unconstitutional search and seizure; unconstitutional cruel and unusual punishment; unconstitutional violations of the Due Process Clause; tortious conduct; intentional infliction of emotional distress; invasion of privacy; violation of the Plaintiffs'

496 (6th Cir. 2009) ("The failure to present any evidence to counter a well-supported motion for summary judgment alone is grounds for granting the motion.").

The Court now turns to the Plaintiffs' remaining § 1983 and state law claims based on Hall's alleged "failure to screen, train, and/or supervise Defendant Tyler as well as [his] failure to take action when [he] knew or should have known of Defendant Tyler's sexual abuse."  [R. 79, p. 4]. As stated above, the Court views these claims as being based on Hall's failure to train or supervise and Hall's failure to protect or enforce policy.  In his Motion, Hall argues that the Plaintiffs' claims are barred by the applicable statutes of limitations and that he is entitled to qualified immunity. The Court will address each of these issues below.

### a.   The Plaintiffs' § 1983 Claims

Under 42 U.S.C. § 1983, plaintiffs have a private right of action against individuals acting under color of state law for civil rights violations.  The Plaintiffs base their remaining § 1983 claims on their right to be free from sexual assault at the hands of a state actor under the Due Process Clause of the Fourteenth Amendment.  [R. 108, pp. 3-4 (quoting *Doe v. Claiborne Cnty. ex rel. Claiborne Cnty. Bd. of Educ*, 103 F.3d 495, 506-07 (6th Cir. 1996) ("[N]o rational individual could believe that sexual abuse by a state actor is constitutionally permissible under the Due Process Clause.")].  Specifically, the Plaintiffs point to Hall's actions, or inactions, as Director of the KYDOC's Division of Probation and Parole as allowing them to have been harmed by Tyler. [*See* R. 79, p. 32 ("[T]hese violations were committed on the basis of [] Defendant Hall's failure to properly screen Defendant Tyler upon application to the DPP and/or on the basis of firsthand knowledge of Defendant Tyler's patently illegal conduct, which conduct was being conducted and remained ongoing while he was an acting Probation and Parole Officer.")].

---

federal civil rights; negligent training and retention; vicarious liability; and 42 U.S.C. § 1983 claims.  [*See* R. 77, p. 4].

### 1.   Statute of Limitations on the Plaintiffs' §1983 Claims

Hall first argues that the Plaintiffs' § 1983 claims are barred by the statute of limitations. Notably, Congress "has never legislated a statute of limitations period for section 1983 actions." *Collard v. Ky. Bd. of Nursing*, 896 F.2d 179, 180 (6th Cir. 1990); *Bonner v. Perry*, 564 F.3d 424, 430-31 (6th Cir. 2009).  Thus, courts "have generally referred to state law for tolling rules, just as [they] have for the length of statutes of limitations."  *Wallace v. Kato*, 549 U.S. 384, 394 (2007). Importantly, however, "federal law determines the event that causes the [] clock to begin to tick (that is, the 'accrual date')."  *Bannister v. Knox Cnty. Bd. of Educ.*, 49 F.4th 1000, 1008 (6th Cir. 2022).  Application of these principles compels the Court to address several points in this case.

The first is easy.  In Kentucky, § 1983 claims like those asserted by the Plaintiffs here are subject to the one-year statute of limitations found in the state's general personal injury statute: KRS § 413.140(1)(a).  *See Collard*, 896 F.2d at 183; *see also Bonner*, 564 F.3d at 430–31 (applying Kentucky's one-year statute of limitations under KRS § 413.140(1) to plaintiff's § 1983 claim against KYDOC after her probation officer sexually abused her).  In their Response, the Plaintiffs argue that their § 1983 claims should be subject to the five-year limitations period under KRS § 413.120(6), which governs "action[s] for an injury to the rights of the plaintiff, not arising on contract and not otherwise enumerated."  [R. 108, pp. 2–3].  However, Sixth Circuit precedent forecloses this argument.

In *Collard*, the plaintiff argued that "since she sustained no injury to the person, but, rather, to [her] rights," the court should apply KRS § 413.120(6)'s five-year statute of limitations to her § 1983 claims.  *Collard*, 896 F.2d at 181 (internal quotations omitted).  The Sixth Circuit disagreed, reasoning that KRS § 413.140(1)(a) is Kentucky's statute of limitations for general personal injury actions, so courts must apply it to § 1983 claims.  *Id.* at 181-82.  Under this reasoning, the

Plaintiffs' assertion that the longer statute of limitations under KRS § 413.120(6) should apply to their § 1983 claims fails.

Second, the Court considers *when* the Plaintiffs' §1983 claims accrued.  Previously, the Court found Smith's § 1983 claim was time-barred based on the theory that Tyler's sexual abuse was the triggering event for the statute of limitations.  [R. 77, p. 14].  However, recent Sixth Circuit decisions lead the Court to reexamine its dismissal of Smith's § 1983 claim.  *See Snyder-Hill v. Ohio State Univ.*, 48 F.4th 686 (6th Cir. 2022); *Bannister*, 49 F.4th at 1000; *see also generally In re Life Investors Ins. Co. of America*, 589 F.3d 319, 326 n.6 (6th Cir. 2009) ("[A] district court may always reconsider and revise its interlocutory orders while it retains jurisdiction over the case.").

First, case law suggests two potential accrual dates depending on whether the presumptive accrual rule or the discovery rule is applied.  *Bannister*, 49 F.4th at 1008.  Under the presumptive accrual rule, the limitations period begins to run "on the first day that a plaintiff may sue on a claim, which occurs once the plaintiff has a complete and present cause of action."  *Id.* (internal quotation marks omitted).  The discovery rule, on the other hand, "delays the start of the limitations period until a plaintiff learns of (or should have learned of) the injury and the party who caused it—even if all of the claim's required legal elements had come into existence before that point."  *Id.*  Second, case law states that, "[b]efore deciding on the specific requirements for a § 1983 claim," courts "must identify the specific constitutional right that the plaintiff has involved."  *Id.* (internal quotation marks omitted).  Here, courts "may choose the statute-of-limitations rules for a specific § 1983 claim only after looking to the common-law principles governing the tort that is 'most analogous' to the alleged constitutional violation."  *Id.*

Notably, these decisions were issued after the Court's prior Memorandum Opinion and Order was entered in this case in March 2021 and after the parties filed their briefing on Hall's summary judgment motion. [*See* R. 77; *see also* R. 107; R. 108; R. 109]. Thus, neither side has had the opportunity to fully address these accrual principles under the Sixth Circuit's recent explanations. Additionally, the current record contains few facts that bear on an accrual analysis.[13] In such a posture, the Court finds questions of fact as to accrual preclude summary judgment on Hall's statute of limitations defense.[14]  *See Campbell v. Grand Trunk W. R.R. Co.*, 238 F.3d 772, 775 (6th Cir. 2001) (noting that, because it is an affirmative defense, "the burden is on the defendant to show that the statute of limitations has run").

One final point bears mentioning in this context. In their Response, the Plaintiffs argue: "For purposes of a one-year statute of limitations, the Plaintiffs timely filed suit once they 'knew or should have known' of their cause of action or violation of their legal rights/legal injury. More specifically, the Plaintiffs were suffering a quasi-disability Ky. Rev. Stat. § 413.170." [R. 108, p. 2]. By use of the phrase "[m]ore specifically," the Plaintiffs appear to argue for a *tolling* provision under Kentucky law, rather than an *accrual* provision under federal law. Yet, as previously

---

[13] Certain case law permits courts to consider whether media reports or other publicity would have placed a reasonable person on notice of her claims when determining accrual. *See Hughes v. Vanderbilt Univ.*, 215 F.3d 543, 549 (6th Cir. 2000). In this case, the Plaintiffs attached to their initial Complaint a news article from March 26, 2019, titled "State probation and parole director fired, in latest corrections shake up." [R. 1-3]. If the Plaintiffs' accrual date were to be viewed as when they learned of Hall's actions, the article from March 2019 could suggest that their § 1983 claims, filed in October 2019, were timely.

[14] In its prior Memorandum Opinion and Order in this case, the Court relied on *Guy v. Lexington-Fayette Urban County Government*, 488 F. App'x 9 (6th Cir. 2012), in finding that the Plaintiffs' underlying sexual abuse was the triggering event for their § 1983 claims. [*See* R. 77, p. 14]. However, in *Snyder-Hill*, the Sixth Circuit found *Guy* was inapposite: "*Guy* . . . interpret[s] Kentucky law, which is of no use to our analysis of when a claim accrues under federal law." *Snyder-Hill*, 48 F.4th at 701. Accordingly, the Court no longer relies on *Guy* for determining the accrual date of the Plaintiffs' claims under federal law. But, even if the accrual date of the Plaintiffs' federal claims is when Tyler's underlying abuse occurred, Parson's claims still survive. *See infra* § III, b., 1.

discussed, an insufficient factual basis is present for the Court to determine when the limitations period on the Plaintiffs' § 1983 claims began to run. Thus, the Court declines to address whether any tolling provision applies to the Plaintiffs' federal claims. Instead, the Plaintiffs' "quasi-disability" argument will be addressed below within the context of their state law claims.

## 2.   Qualified Immunity on the Plaintiffs' § 1983 Claims

The Court next considers whether Hall is entitled to qualified immunity on the Plaintiffs' § 1983 claims. This doctrine shields government officials from civil liability under § 1983 "unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (internal quotation marks omitted). A court may address the prongs in either order and need not address both if one is lacking. *Crawford v. Tilley*, 15 F.4th 752, 760 (6th Cir. 2021).

The Plaintiffs' federal claims against Hall are based on his position as Director of the Division of Probation and Parole. Under federal law, "government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). "In other words, a supervisor cannot be held liable simply because he or she was charged with overseeing a subordinate who violated the constitutional rights of another." *Peatross v. City of Memphis*, 818 F.3d 233, 241 (6th Cir. 2016). Rather, supervisory liability requires (1) active involvement by the supervisor, and (2) a causal connection between the supervisor's active involvement and the violation of clearly established rights. *Crawford*, 15 F.4th at 761-62; *see also Peatross*, 818 F.3d at 241-42.

To prove active involvement, a plaintiff must show that the supervisor "at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending subordinate." *Crawford*, 15 F.4th at 761 (quoting *Garza v. Lansing Sch. Dist.*, 972 F.3d 853, 865

(6th Cir. 2020)) (internal quotation marks omitted).  The supervisor must have actively engaged in some unconstitutional behavior but need not have "physically put his hands on the injured party or even physically been present at the time of the violation." *Garza*, 972 F.3d at 865 (quoting *Peatross*, 818 F.3d at 242-43).  However, a plaintiff must demonstrate more than mere negligence or recklessness.  *Id.* at 866.

In this case, the Plaintiffs have put forward no evidence in support of their § 1983 claim based on Hall's failure to train or supervise.  Indeed, the Plaintiffs do no more than acknowledge that Hall was the Director of the Division of Probation and Parole, and in that office, he oversaw roughly 400 probation and parole officers and their training on "anti-harassment, anti-abuse, sexual harassment prevention, and reporting practices and policies." [*See* R. 108, pp. 5-6 (quoting R. 107-1, p. 4)].  To be sure, the Plaintiffs talk only in generalizations, and their Response is devoid of any specifics on Hall's training.

Rather, the Plaintiffs rely on conclusory allegations, like: "Clearly, Tyler's multiple rapes of the Plaintiffs (and others not even plaintiffs in this action) are sufficient facts and evidence supporting the Plaintiffs' allegations of Hall's failure to train and supervise/enforce"; and, "The mere fact that rape and sexual assault happened more than once is evidence of failure on some level of the 'prevention' aspect of Hall's training of probation and parole officers." [*See id.* at 7].  Such conclusory allegations do not raise a genuine issue of material fact as to Hall's active involvement based on a failure to train or supervise.  *See Johari v. Big Easy Rests, Inc.*, 78 F. App'x 546, 548 (6th Cir. 2003) (order) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)) ("Conclusory allegations do not create a genuine issue of material fact which precludes summary judgment.").  Accordingly, the Court will grant summary judgment on all the Plaintiffs' § 1983 claims based on a theory of failure to train or supervise.  *See Reed v. Speck*, 508 F. App'x

415, 421 (6th Cir. 2012) ("To succeed on a failure to train or supervise claim, a plaintiff must show that the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it.") (internal quotation marks omitted).

Next, the Court observes that the Plaintiffs have not clearly articulated what theory on which they base their federal failure to protect or enforce policy claims. For example, they do not argue that a "special relationship" existed between Hall, as Director of the Division of Probation and Parole, and the Plaintiffs such that Hall had an affirmative duty to protect them. *See, e.g.*, *DeShaney v. Winnebago Cnty. Dept. of Soc. Servs.*, 489 U.S. 189, 200 (1989) (finding that a state's "affirmative duty to protect arises not from the [s]tate's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf"). Without any legal framework put forward by the Plaintiffs on this claim, the Court views their federal failure to protect or enforce policy claims as being based on a theory of supervisory liability.

One of the elements of a supervisory liability claim is that the defendant's active involvement caused a plaintiff's harm. *See Crawford*, 15 F.4th at 761-62; *see also Sexton v. Cernuto*, 18 F.4th 177, 185 (6th Cir. 2021) ("In other words, the most pertinent factor for analyzing § 1983 liability is the causal relationship between the government official's actions and the alleged constitutional violation."). On this prong, Smith and Musinski's failure to protect or enforce policy claims fail. Indeed, evidence in the record suggests that Hall first learned about Tyler's abuse in August 2018 [R. 87, pp. 38-40], which was *after* Tyler's abuse of Smith and Musinski ended. [*See* R. 88, p. 24 (Tyler's abuse of Smith ended when she went to prison, which was, at the latest, July 2018); R. 90, pp. 12-13 (Cammie's daughter testified that Cammie did not see Tyler again after she was raped in January 2018)]. Without any evidence to the contrary, Smith

and Musinski cannot show the causal connection required to survive summary judgment on their failure to protect or enforce policy § 1983 claims.

Parson's federal claim on this theory is a closer call. Because Hall may have been put on notice of Tyler's abuse in August 2018, his failure to act could be found to have caused Parson's harm, at least to the extent that she experienced any abuse or harassment by Tyler after August 2018. Certain facts in the record are particularly relevant to this claim.

For example, Hall's termination letter includes troubling allegations of Hall's violation of various policies and regulations related to sexual abuse complaints. [R. 87, pp. 38-40]. Further, during his deposition, Hall admitted that he failed to take any action concerning one offender's report that she had been sexually assaulted even after receiving an affidavit substantiating her allegations against Tyler. [*See id.* at 15]. And, the termination letter suggests that Hall became "irate" after learning that the recording was used during a hearing, that he failed to act in response to J.C.'s complaint, and that he self-reported his failure to investigate certain allegations. [*Id.* at 38-40]. Hall even testified as to the significance of such a failure to act: "I realized this was a very serious matter. And as one of many people involved in the entire scenario, I understood how serious it was to have sexual harassment allegations, and that anybody who plays a role in that, or potentially could have contributed, should be very concerned." [*Id.* at 16].

This evidence could support a finding that Hall played "more than a passive role" in Tyler's misconduct and that such a failure was causally related to Parson's harm. *See Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999) (finding genuine issue of material fact existed on plaintiff's § 1983 excessive force claim against police supervisor where plaintiff presented evidence that the supervisor failed to intervene to stop the assault, attempted to cover up the incident, and provided false testimony about the incident). For his part, Hall maintains that he *did* follow KYDOC policy.

[*See* R. 107-1, p. 15].  But, neither he nor Parson has explained the significance of his termination letter and its contents regarding Hall's actions or inactions related to multiple sexual assault allegations involving Tyler to the Court.  [*See* R. 87, pp. 38-40 (listing Hall as having violated "CPP 14,7 *Sexual Abuse Prevention*") (emphasis added)].  The Court is thus left without the parties' positions as to its relevance for Parson's remaining § 1983 claim.

Although the Court is not inclined to chase down arguments that the parties did not present in their briefs, it is also unwilling to ignore the letter's appearance in the record, particularly if the letter bears on Parson's federal failure to protect or enforce policy claim against Hall.  Accordingly, the Court will deny Hall summary judgment on this claim at this time, but the Court will also permit further limited briefing from the parties on this claim.

### b.  The Plaintiffs' State Law Claims

The Plaintiffs' state law negligence claims are based on the same theories as their §1983 claims.  Now, the Court will consider the parties' statute of limitations and qualified immunity arguments in the state law context.

### 1.  Statute of Limitations on the Plaintiffs' State Law Claims

The Plaintiffs' state law claims against Hall are subject to a one-year statute of limitations. *See Roman Catholic Diocese of Covington v. Secter*, 966 S.W.2d 286, 288 (Ky. Ct. App. 1998) (applying one-year statute of limitations from KRS § 413.140(1)(a) to plaintiff's claim "that the Diocese negligently hired, supervised, and retained [the abuser] as a teacher and guidance counselor in its schools"); *see also Borders v. Conrad*, No. 2021-CA-0793-MR, 2022 WL 3329452, at *2 (Ky. Ct. App. Aug. 12, 2022) (holding statute of limitations in a sexual assault case against individuals other than the offender was one year under KRS § 413.140(1)(a)).  Notably, Kentucky courts have declined to follow the discovery rule in sex abuse cases, so the Court must

view the accrual date of the Plaintiffs' state law claims as when Tyler's abuse against them occurred.  *See Secter*, 966 S.W.2d at 288.

On this record, Tyler's abuse against Smith ceased, at the latest, in July 2018 when she returned to prison, his abuse against Musinski ended in January 2018 with her rape, and his abuse against Parson continued through October 2018.  [*See* R. 88, p. 24; R. 90, pp. 12-13; R. 89, p. 7)].  The Plaintiff's initial Complaint was filed on October 7, 2019.  [R. 1].  Based on these dates, only Parson's state law claims survive the one-year statute of limitations in a direct application; Smith and Musinski's claims will only survive if a tolling provision applies.

In their Response, the Plaintiffs argue that KRS § 413.170(1) should apply because they were under a "quasi-disability."  [R. 108, p. 2].  This Kentucky statute "specifically tolls the statute of limitations while a would-be plaintiff is 'of unsound mind'—that is, while he is incapable of handling his own affairs, even if not technically insane."  *Green v. Floyd Cnty.*, 803 F. Supp. 2d 652, 654 (E.D. Ky. 2011).  However, Smith and Musinski provide no record citations or factual support for this argument.[15]  Instead, they only cite out-of-circuit cases discussing "the continuing violations" doctrine.  [*See* R. 108, p. 2]; *see also Woods v. City of Columbiana*, No. 2:15-cv-493-RDP, 2016 WL 454613, at *6 (N.D. Ala. Feb. 5, 2016) (discussing the *Eleventh Circuit's* application of the continuing violations doctrine to § 1983 claims); *see also Donaldson v. O'Connor*, 493 F.2d 507, 529 (5th Cir. 1974), *vacated* 422 U.S. 563 (1975), *and vacated sub nom*, *Gumanis v. Donaldson*, 422 U.S. 1052 (1975).  This case law is neither controlling nor relevant to any assertion that Smith or Musinski was suffering from a quasi-disability under Kentucky law.

---

[15] Importantly, such cursory treatment by the Smith and Musinski on this claim is reason enough for the Court to grant summary judgment to Hall.  *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation are deemed waived.  It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones.") (cleaned up).

- 23 -

Without facts or law to support their position, Smith and Musinski's tolling argument fails, and the Court will grant summary judgment to Hall on their state law claims.

## 2.   Qualified Official Immunity on Parson's State Law Claims

After application of Kentucky's statute of limitations, only Parson's state law claims against Hall remain.  On these claims, the Court must consider whether Hall is entitled to qualified official immunity.  Under Kentucky law:

> Qualified official immunity applies to the negligent performance by a public officer or employee of (1) discretionary acts or functions, *i.e.,* those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment []; (2) in good faith; and (3) within the scope of the employee's authority. . . .

> Conversely, an officer or employee is afforded no immunity from tort liability for the negligent performance of a ministerial act, *i.e.,* one that requires only obedience to the orders of others, or when the officer's duty is absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts.

*Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001).

As above, Parson puts forward no evidence to support a state law claim based on Hall's alleged failure to train or supervise.  *See supra* § III, a., 2.  Rather, Parson only makes broad assertions about Hall's training responsibilities as the Director of the Division of Probation and Parole.  Such conclusory allegations do not create a genuine issue of material fact on this claim. *See Johari*, 78 F. App'x at 548.  Indeed, Parson has not pointed to specific *training* policies that Hall failed to follow, which was an important component in the cases she relies on in support of this claim.  *See Finn v. Warren Cnty.*, 768 F.3d 441, 450 (6th Cir. 2014); *see also Hedgepath v. Pelphrey*, 520 F. App'x 385, 390 (6th Cir. 2013) ("Instead, this case involves a relatively straightforward policy with unambiguous instructions.").  Without more, the Court will grant Hall summary judgment on this claim.  *See, e.g., Lawrence for estate of Hoffman v. Madison Cnty.*, 695

F. App'x 930, 934 (6th Cir. 2011) (denying qualified immunity at summary judgment on Kentucky state law negligence claim based on jailer's failure to follow a specific training policy).

Thus, only Parson's state law claim based on Hall's failure to protect or enforce policy remains. Like her federal claim based on the same theory, Parson has not pointed to any legal framework for her Kentucky failure to protect or enforce policy claim. For example, she does not argue that Hall's position as Director created a special relationship with Parson as a parolee. *See generally Lane v. Commonwealth*, 956 S.W.2d 874, 877 (Ky. 1997) (Cooper, J., concurring) ("In the context of civil liability, we have recognized that when a person is in the custody of the state a 'special relationship' exists which gives rise to a legal duty of the state to protect that person from harm inflicted by another.").

Still, genuine issues of material fact preclude the entry of summary judgment on this claim. As discussed previously, Hall's termination letter and deposition testimony suggest that he failed to enforce or follow certain policies and that his actions or inactions placed individuals at risk. [See R. 87]. Although the parties do not address Hall's letter, the Court is not inclined to ignore it or its allegations. In such a posture, the Court will deny Hall summary judgment on this claim at this time. However, it will permit further limited briefing on this claim.

## IV.   CONCLUSION

Accordingly, for the reasons discussed above, and with the Court being otherwise sufficiently advised,

**IT IS HEREBY ORDERED** as follows:

1.      Hall's Motion for Summary Judgment **[R. 107]** is **GRANTED** in part.

2.      Hall's Motion for Summary Judgment **[R. 107]** is also **DENIED** in part **WITHOUT PREJUDICE**.  Specifically, only Parson's § 1983 and state law claims based on Hall's alleged failure to protect or enforce policy survive.

3.      Other than Parson's two remaining claims, all the Plaintiffs' claims against Hall are **DISMISSED WITH PREJUDICE**.

4.      Should any party wish to file a dispositive motion on Parson's remaining claims, it may do so within **thirty (30)** days of the entry of this order.  Any such briefing should explicitly address, among other relevant matters, the import of Hall's termination letter.  Further, the Court would suggest that the parties pay close attention to the differing standards governing qualified immunity under federal and state law.

This the 22nd day of February, 2023.


*Claria Horn Boom*

CLARIA HORN BOOM,
UNITED STATES DISTRICT COURT JUDGE
EASTERN AND WESTERN DISTRICTS OF
KENTUCKY