UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

STEPHANIE SMITH, *et al.*,               )
                                          )
        Plaintiffs,                       )        Civil Action No. 3:19-CV-721-CHB
                                          )
v.                                        )
                                          )        **MEMORANDUM OPINION**
RONALD R. TYLER, *et al.*,               )        **AND ORDER**
                                          )
        Defendants.                       )

**\*\*\*   \*\*\*   \*\*\*   \*\*\***

This matter is before the Court on the cross-motions for summary judgment filed by the remaining parties to this litigation. *See* [R. 114 (Plaintiff Bridgett Parson's Motion)]; [R. 115 (Defendant Johnathan Hall's Motion)]. The motions stand submitted for review. *See* [R. 117 (Hall's Response)]; [R. 118 (Parson's Reply)]. For the following reasons, both motions will be denied.

I.      **Background**

The factual circumstances underlying this litigation and its lengthy procedural history have been extensively documented by the Court in prior Memorandum Opinions and Orders. *See* [R. 77]; [R. 113]. Parson (the sole remaining plaintiff) claims that Hall (the sole remaining defendant) is liable to her for his actions or inactions as the (former) Director of the Division of Probation and Parole within the Kentucky Department of Corrections (KYDOC), which she alleges allowed her to be sexually assaulted by her parole officer, Ronald Tyler. *See generally* [R. 79 (Amended Complaint)]; [R. 113 (Memorandum Opinion and Order)]. Through earlier motions practice, Parson's claims against Hall have been narrowed to: (1) a claim under 42 U.S.C. § 1983 for failure

- 1 -

to protect or enforce and follow policy; and (2) a Kentucky negligence claim for failure to protect or enforce and follow policy.[1]  *See* [R. 113, p. 26].

When the Court considered Parson's remaining claims previously, it observed that neither Parson nor Hall had discussed the significance of Hall's termination letter from KYDOC, which cited numerous instances of his failure to enforce and follow policy as the grounds for his dismissal.  *See id.* at 25 ("Hall's termination letter and deposition testimony suggest that he failed to enforce or follow certain policies and that his actions or inactions placed individuals at risk. Although the parties do not address Hall's letter, the Court is not inclined to ignore it or its allegations.") (internal record citation omitted); *see also* [R. 114-2].[2]  The Court therefore denied Hall's prior motion for summary judgment as to Parson's remaining claims, but permitted additional limited briefing from the parties to specifically address the relevance of Hall's letter and other facts in the record as related to those claims.  *See* [R. 113, p. 26] ("Should any party wish to file a dispositive motion on Parson's remaining claims, it may do so within thirty (30) days of the entry of this order.  Any such briefing should explicitly address, among other relevant matters, the import of Hall's termination letter.").  Parson and Hall each elected to file motions for summary judgment, and both motions stand submitted for review.  *See* [R. 114 (Parson's Motion)]; [R. 115 (Hall's Motion)]; [R. 117 (Hall's Response)]; [R. 118 (Parson's Reply)].

### a.  Parson's Claims

Parson was under Tyler's supervision while on parole for several years beginning around December 2016, and she saw him roughly 36 times while under his supervision.  *See* [R. 89, pp.

---

[1] The Court previously determined that Parson's other claims and those by the other plaintiffs (Stephanie Smith and the estate of Cammie Musinski) failed as a matter of law.  *See* [R. 77]; [R. 113].

[2] Hall's termination letter appears in the record multiple times.  For consistency in this Memorandum Opinion and Order, the Court will cite to the letter appearing at [R. 114-2].

50, 67].[3]  Beginning with Parson's first visit with Tyler, Tyler initiated discussions about her personal life that she viewed as inappropriate.  *Id.* at 51–52.  The behavior escalated from there. During her second visit, Parson observed that Tyler had pulled up her social media profile on his computer and "told [her] he loved [her] picture," *id.* at 57:20, and as she was preparing to leave her third visit, Tyler kissed her on the cheek, *id.* at 58.  When she was leaving her fourth visit, Tyler kissed her on the mouth.  *See id.* at 60.  The next time she saw Tyler, Parson told him that she did not feel comfortable with physical contact with him while he was her supervising parole officer.  *Id.* at 60–61.

From then on, Tyler began pursuing Parson more aggressively.  When Parson was in Tyler's office, he repeatedly "tried to stick his tongue down [her] throat" and "then it went to groping, groping after that."  *Id.* at 62:22–63:1.  When Parson was outside of the office, Tyler would incessantly call her and "just kept trying to get [her] to meet him out," and, on several occasions, Tyler found Parson at various places, including at her aunt's home, a car wash, and a store.  *See id.* at 63:7–8, 62–77.  Throughout this period, Parson tried to rebuff Tyler's advancements.  *Id.* at 62–69.

At some point, Tyler requested that Parson send him "some sexy pictures."  *Id.* at 80:17. Parson said she sent the pictures, explaining: "I thought that if I just send him the pictures, he wouldn't -- he would pressure me to meet him out because he was really getting -- upset about me putting him off."  *Id.* at 80:24–81:2.  At Tyler's urging, Parson would eventually send ten to fifteen photographs of herself that she described as inappropriate, including several nude photographs.

---

[3] Several PDF transcripts of depositions that appear in the record contain four pages of testimony per document page.  *See, e.g.*, [R. 87]; [R. 89].  The page numbers for all deposition transcripts cited herein refer to the internal pagination and line numbers (where appropriate).

*Id.* at 78–85.  During her deposition, Parson testified that she sent at least one photograph to Tyler

on October 8, 2018.  *Id.* at 18–21.

> Parson did not initially report Tyler's abuse to authorities; she explained:
>
> [T]here was no supervisor out there on that site and actually, I didn't know what
> was going on.  I was kind of in shock because he -- he never closed the door or tried
> to hide anything.  So I didn't know what to think about it, actually.
>
> . . . I didn't want to make him mad.  I would make him mad and tried -- but I don't
> ask -- I didn't want to go back to prison -- I didn't want to go back to prison, I had
> a lot [of] time and I just wanted to get through my parole and get it -- get -- and get
> it done.

*Id.* at 78:11–15, 78:20–25.  Concerning timing, Parson testified that the "big harassment" by Tyler

"stopped" about six months before Tyler was suspended in October 2018 (so roughly April 2018),

leaving "just the office -- the office thing."  *See id.* at 91:5–9.  She also testified that her most

recent unwelcome contact with Tyler occurred at the probation office "[r]ight before he got

suspended" (in October 2018).  *Id.* at 89:4–9.  The October date is notable because certain evidence

in the record suggests that Hall, whom Parson seeks to hold accountable now, might have known

about allegations concerning Tyler roughly two months earlier (in August 2018).  Parson and the

other plaintiffs settled their claims against Tyler in August 2023.  *See* [R. 104]; [R. 112].

### b.  Hall's Termination

Hall was director of the Division of Probation and Parole from November 1, 2016, until

March 25, 2019.  [R. 87, p. 19].  Parson seeks to hold Hall accountable for her injuries by alleging

that Hall's actions or inactions in his leadership role led her to be harmed by Tyler.  *See generally*

[R. 113] (construing Parson's claims).

 Before becoming director, Hall had held various positions within KYDOC over his

seventeen years of employment, including several as a supervisor.  *See* [R. 87, pp. 10–21].  In

many of those roles, Hall received training on workplace harassment, abuse, and prevention,

including sexual abuse and harassment prevention.  *See id.* at 13–14, 16–18.  Hall testified that, at one point in a supervisory role, he had been involved in the disciplinary process of a subordinate staff member who was in an inappropriate relationship with another staff member.  *See id.* at 16.

As director, Hall continued to receive training, and he was responsible for overseeing the roughly 400 probation and parole officers under his supervision.  *See id.* at 20–21, 26–29.  Notably, Hall testified that every staff person within the division was required to complete an annual in-service training and "to sign a form acknowledging they had reviewed every policy applicable to the division, including the sexual harassment prevention policies."  *See id.* at 20:24–21:6.  As director, Hall was personally subject to his own training and to signing such an acknowledgment.  *See id.* at 21:7–10.

In his role as director, Hall did not directly supervise the officers under him.  *Id*. at 44–45.  For instance, Hall testified that Tyler's district supervisor was Trent VanMeter, who reported to Mark Stonex, who was supervised by Kirk Gausepohl,[4] who was in turn overseen by Hall.  *Id*.  Still, Hall testified that, once he became director, the misconduct of any probation or parole officers became his responsibility.  *See id.* at 19:21–20:2 ("Q  All right.  So if any of [the probation and parole officers] were engaged in any improper activities and such, it was, to put it bluntly, not your problem [when you were in your previous roles]?  A  That is correct.  Q  All right.  So technically, it becomes your problem once you become the Director of the Division of Probation and Parole, right?  A  Yes.").  He also testified that, before the situation involving Tyler, there had been other allegations of sexual harassment by probation or parole officers, which were:

> reported via a written statement, either a supervisor, referred for investigation, depending on the timing to either the Department of Corrections central office Internal Investigations Branch or the Justice Cabinet Internal Investigations

---

[4] In its prior Memorandum Opinion and Order, the Court spelled this individual's name as it appeared in Hall's deposition transcript.  *See* [R. 87, p. 45:14]; *see also* [R. 113, p. 6].  However, the present record suggests a different spelling.  *See, e.g.*, [R. 114, p. 2].

Branch, and they would be investigated.  And depending on the outcome of that investigation, disciplinary action may or may not be taken.

*Id.* at 22:25–23:8.  Hall testified that complaints would eventually be reported to him, and although he did not oversee or participate in the investigations, he would have been the one to take any disciplinary action necessary.  *See id.* at 23.  Hall then summarized how complaints were handled:

> [T]he Division of Probation and Parole is a division within the Department of Corrections.  Prior to early 2018, the Department of Corrections had a central office investigative branch.  In early 2018, the central office Department of Corrections Internal Investigation Branch was absorbed by the Justice Cabinet.  The way that these -- the way that this process would work is a written sub -- by policy, and a written statement was drafted and submitted to a supervisor, referred up the probation and parole chain of command, and -- and then myself or one of the assistant directors would refer that allegation to either the department's Internal Investigation Branch or the Justice Cabinet, depending on the timing, so that they could begin an investigation.

*Id.* at 24:19–25:8.  Thus, Hall testified that it was his responsibility (or that of his direct subordinates) to refer allegations of sexual abuse and harassment for investigation.

On March 25, 2019, Hall was "officially dismissed with cause from duty" as Director of the Division of Probation and Parole.  *See* [R. 114-2, p. 1]; *see also* [R. 87, p. 42:23] ("This is a letter I was issued on March 25, 2019, dismissing me from my position as director of the Division of Probation and Parole."); [R. 118-2 (Media Reports)].  According to his termination letter, which appears in the record, KYDOC found Hall's dismissal "justified based upon the following specific reason(s): 101 KAR 1:345; Section 1, unsatisfactory performance of job duties; and violation of CPP 3.22, Staff Sexual Offenses and CPP 14.7, Sexual Abuse Prevention."  *See* [R. 114-2, p. 1]; *see also* [R. 118-2 (Media Reports)].  The letter is signed by John Tilley,[5] then-Secretary of the

---

[5] Tilley was arrested and charged under Kentucky law with first-degree rape in October 2022.  *See Commonwealth v. Tilley*, No. 22-CR-00899 (Fayette Circuit Court indictment filed October 11, 2022).  Trial in that case is scheduled for summer 2024.

Justice and Public Safety Cabinet, and it details various instances in which KYDOC found Hall improperly handled allegations of abuse involving Tyler. *See* [R. 114-2, pp. 2–3].

During his deposition, Hall was questioned at length about his termination letter and its multiple allegations against him. *See* [R. 87]. Although Hall denied certain allegations in the letter, his testimony corroborates many of its details. *See id.* To help ensure a full record, and because Hall's deposition tracks the letter's allegations, the Court will discuss the allegations contained in the letter and Hall's testimony in relation to each incident. The Court will also discuss other instances in which Hall became aware of allegations against Tyler.

### 1. First Incident – S.K.

Hall's termination letter first references a KYDOC investigation in 2019, during which Probation and Parole Northern Regional Manager Daniel Fountain was interviewed. [R. 114-2, p. 1]. According to the letter, Fountain described having attended a preliminary probable cause hearing on August 30, 2018, held by a KYDOC Attorney Law Judge, during which a case was presented involving a parolee ("S.K.") who had absconded and who was supervised by Tyler. *Id.* The letter notes that Fountain reported that, during the hearing, S.K.'s counsel stated that his client had been sexually harassed and assaulted by Tyler, and that "[t]his was confirmed in a secret audio recording (date unknown) between Mr. Tyler and [S.K.] and in an affidavit signed on August 2, 2018 by [S.K.]." *Id.* According to the letter, S.K.'s counsel stated during the hearing that his client had absconded for fear of being raped by Tyler and requested a transfer to a new probation and parole office. *Id.*

The letter further states that, after the hearing, Fountain immediately contacted Probation and Parole Western Regional Manager Stonex and Hall to advise of the hearing and Fountain's concerns regarding Tyler. *Id.* In the letter, Fountain reported that, during the conversation, Hall

became irate when he learned the audio recording had been played at the hearing because Hall had "spoken with the attorney regarding the recording and he had agreed not to share the recording at [S.K.'s] hearing." *Id.* at 1–2. Thus, a fair reading of the letter suggests that Hall became angry after learning that the audio recording between S.K. and Tyler was played at S.K.'s hearing because he had been informed that the recording would not be played; a fair reading would also suggest that Hall was aware of the contents of the recording and thus the allegations against Tyler.

According to the letter, no documentation was found indicating that Hall requested an official investigation into S.K.'s claims. *Id.* at 2. To the contrary, the letter notes that officials who later investigated allegations against Tyler were unaware of S.K.'s claims, specifically Probation and Parole PREA[6] Investigator Lise-Marie VanNostrand[7] (when interviewed) had no knowledge of S.K. as being an alleged victim of Tyler and the Kentucky State Police (KSP) also confirmed that S.K. had not been reported as an alleged victim of Tyler.[8] *Id.*

As mentioned, Hall's deposition testimony explains and tracks significant portions of the letter. When asked about the S.K. incident during his deposition, Hall testified that he was aware of the preliminary probable cause hearing that had been held on August 30, 2018. *See* [R. 87, p. 44]. Hall further testified that these allegations first came to his attention on August 1, 2018, when he received a call from then-Secretary Tilley around 10:00 p.m. *See id.* at 46. During their call,

---

[6] Prison Rape Elimination Act.

[7] This individual's name appears in the record as Lisa and Lise.

[8] At the time of Hall's termination in March 2019, Tyler was being investigated "by KSP for misconduct involving several women while in his probation and parole officer position." *See* [R. 114-2, p. 2]. In December 2021, Tyler pled guilty in state court to charges of tampering with physical evidence and official misconduct; sexual abuse charges against him were dismissed. *See Commonwealth v Tyler*, No. 20-CR-00335 (Bullitt Circuit Court indictment filed Sept. 30, 2020). In December 2023, Tyler also pled guilty to federal charges for deprivation of rights under color of law and obstruction of justice. *See United States v. Tyler*, No. 3:22-CR-066-CHB-RSE (W.D. Ky. 2023) [R. 1; R. 59; R. 60, *therein*].

Tilley told Hall that he had received a phone call from Dan Goyette with the Louisville Metro Public Defender's Office and that Goyette had reported to him he had information regarding a sexual assault by a probation and parole officer. *See id.* at 46–47. Tilley asked Hall to attempt to reschedule the parole revocation hearing, which was originally scheduled for the following day, August 2, 2018. *See id.* at 47. Hall testified that he worked with Goyette to delay the hearing, and in fact, Hall testified that he directly contacted the administrative law judge (Kim Morris) to get the hearing moved. *See id.* at 47–48, 50. The next day, Hall texted with then-Secretary Tilley, who thanked him for getting the hearing moved. *See id.* at 56–57.

Hall testified that, at the time he was asked to reschedule the hearing, he only knew the name of the victim involved (S.K.), but was not told who the officer was. *See id.* at 50. He testified that he did not even ask who the officer was:

> A  . . . As I mentioned a few moments ago, when we had this exchange with Dan Goyette and John Tilley, there was no discussion of who the officer was. The only name I was given was [the] name of the victim, [S.K.].
>
> Q  And did you go research and find out who [S.K.]'s officer was?
>
> A  I did not.
>
> Q  Why not?
>
> A  At that point, I was asked to reschedule the preliminary pro-ratification hearing, which I did, contacting the administrative law judge.  I had also asked that the Louisville Metro Public Defender's Office provide any evidence or documentation they had so that the claim could be investigated.  But at that point, I had not been told the name Ron Tyler.
>
> Q  You did not have any natural curiosity as to which of your officers was being accused and you easily could have identified that person by looking up the name of the offender?
>
> A  I expected that I would be provided with the evidence and documentation that they said they had and was waiting to receive it.

*Id.* at 50:7–51:4.

Hall confirmed that, less than two weeks later, he *was* provided with such documentation and evidence when Goyette (with the Louisville Metro Public Defender's Office) emailed him S.K.'s affidavit on August 14, 2018.  *See id.* at 63.  However, Hall testified that he only "found" the S.K. affidavit seven months later on March 22, 2019, when he discovered the affidavit in his files.  *See id.* at 53, 63.  Here, the Court notes there is no record of Hall or anyone else initiating an investigation into S.K.'s sworn allegations and that Hall's discovery of the affidavit in his files in March 2019 came many months after multiple allegations involving Tyler had first surfaced in late summer 2018 and more than two months after Tyler had been terminated in January 2019.  *See generally id.* at 59–61 (discussing Tyler's placement on administrative leave in October 2018 and termination in January 2019).  Finally regarding the S.K. incident, Hall testified that he did not recall any conversation where he became irate (which was alleged in the letter).  *See id.* at 48.

## 2.  Second Incident – J.C.

After its discussion of the S.K. incident, Hall's termination letter next addresses an investigation by VanNostrand into complaints against Tyler for sexual harassment by two other women under supervision.  [R. 114-2, p. 2].  Here, the letter states that, on approximately August 16, 2018, a woman under supervision ("J.C.") filed a sexual harassment complaint against Tyler with other probation and parole officers.  *Id.*  That complaint was forwarded to Stonex, who forwarded the complaint to VanMeter.[9]  *Id.*  Several weeks later on September 28, 2018, VanMeter mentioned the complaint to VanNostrand, believing the investigation had been assigned to her, but VanNostrand had no knowledge of the complaint.  *Id.*  VanNostrand then followed up with Hall the same day regarding the complaint, and Hall told VanNostrand that J.C.'s complaint was not known to him and an investigation had not occurred.  *Id.*

---

[9]  Recall that, according to Hall's testimony, VanMeter was Tyler's district supervisor; he reported to Stonex, who was supervised by Gausepohl, who was in turn overseen by Hall.  *See* [R. 87, pp. 44–45].

The letter continues that, on October 10, 2018, VanNostrand and another PREA investigator interviewed Tyler, and during the interview when discussing J.C.'s complaint, Tyler stated that he had been contacted by phone by Assistant Director Gausepohl on an undetermined date and asked about the complaint filed by J.C. and was asked if he "said something about a sexual position." *Id.* According to the letter, Gausepohl was later interviewed regarding the conversation he had with Tyler, and he stated that he did make the call to Tyler and that Hall was aware of the complaint. *Id.* However, the letter states that, "[b]efore the interview held on October 10, 2018," Hall stated he had no knowledge of the complaint. *Id.* The letter also states that no documentation was found that the conversation between Tyler and Gausepohl took place or that an official investigation was conducted into J.C.'s complaint. *Id.*

During his deposition, Hall discussed the circumstances involving J.C.'s complaint. For this allegation, Hall began by emphasizing the "policy-driven reporting structure for sexual harassment complaints"—which involves a written complaint (by someone who witnessed sexual harassment) that is first referred to a supervisor then to a regional manager and then to an assistant director and Hall—and said such a process occurred in J.C.'s case. *See* [R. 87, pp. 49:1–50:2]. Specifically, Hall testified that on August 16, 2018, J.C. "validate[d]" a sexual harassment allegation against Tyler, so District Supervisor VanMeter wrote up a complaint that documented what J.C. had said and forwarded the complaint to Stonex; Stonex then forwarded the complaint to Assistant Director Gausepohl and Hall. *See id.* Hall further testified that, because he was out of the office at the time, Gausepohl read through the documentation he received and contacted the Justice Cabinet's Internal Investigations Branch and asked if that entity wanted to open an investigation. *See id.* According to Hall, the Internal Investigations Branch responded that it did not, which occurred on August 20, 2018. *See id.* The Court notes that the division's receipt of

J.C.'s complaint on August 16, 2018, was only two days after Goyette had emailed S.K.'s affidavit to Hall.  *See id.* at 63.

Hall recalled these events as involving a conversation where Assistant Director Gausepohl came into Hall's office and explained to Hall that the division had received a sexual harassment allegation, but that there did not appear to be merit to the complaint.  *See id.* at 49–50.  Hall also did not recall Assistant Director Gausepohl telling him the officer involved with J.C.'s complaint was Tyler.  *See id.* at 51:9–11.  Instead, Hall again testified that he did not even ask the name of the officer and did not have a natural curiosity to find out who it was:

Q  . . . You say you did not know who the officer was . . . overseeing [J.C.]?

A  I did not.

Q  And you didn't have any natural curiosity to research that?

A  I trusted that when my assistant director told me he had looked into it, that he had done so, that if he said that there was nothing there, I believed him.

*Id.* at 51:14–22.  As with the S.K. incident above, the record contains no documentary evidence of J.C.'s complaint or any demonstration that J.C.'s complaint was referred for a formal investigation.  During his deposition, Hall did not address the letter's allegation that he was not forthright with VanNostrand regarding what he knew concerning J.C.'s complaint.

### 3.  Other Incidents

The incidents involving S.K. and J.C. both occurred in August 2018.  During his deposition, Hall testified regarding other allegations against Tyler that were reported to him around this time (but were not addressed in the letter).  *Compare* [R. 114-2], *with* [R. 87].  For example, during his deposition, Hall was specifically asked when he first realized Tyler was a problem.  *See* [R. 87, p. 58].  In response to that question, Hall stated that he learned Tyler's name on August or September 19, 2018, when the division received a separate complaint (not involving S.K. or J.C.):

The division received a complaint from a treatment center in Ohio indicating that another victim had been sexually harassed by Mr. Tyler. That complaint was received by a District 5 supervisor, Trent VanMeter and he reported it to Lisa VanNostrand who is a department PREA investigator. She typically oversaw investigations for inmates or supervisees and halfway houses. Presumably -- I'm not sure of that, but presumably, he reported to her because this offender was in a treatment center in Ohio. . . .

Lise contacted me. I said there wasn't much substance to the complaint, but said she wanted to check into it a little bit further. I asked her to please do so, that -- see what information she could gather. And over the course of the next few weeks, she substantiated there -- the allegation may be true, also identified a few other victims, and I asked her to, you know, follow up and let me know what she found. So she did that. And in early October, she advised me that she had found information that made the complaints seem credible. So at that point, I decided to place Mr. Tyler on administrative leave with pay pending the investigation. Investigator VanNostrand asked if I could wait until October 10 when she had the opportunity to investigate -- to interview Tyler in person. I agreed to do so. So following his interview with Lise VanNostrand and another PREA investigator on October 10, he was placed on investigative leave.

*Id.* at 58:23–59:7, 59:9–60:1, 75–76. Tyler's employment was officially terminated on January

15, 2019. *Id.* at 61. Hall also testified that, before March 22, 2019 (when he found the S.K.

affidavit in his files), he was never asked about Tyler by anyone and did not participate in any

investigations. *See id.* at 57.

### 4. Hall's Self-Reporting

Other than Tyler's termination, the record contains little information concerning Hall's

actions between October 2018 (when Tyler was placed on administrative leave) and March 2019,

when Hall's termination letter and deposition testimony reflect he "self-reported" his failure to

take appropriate action.

The Court first considers the letter's contents. Here, according to the letter, on March 22,

2019, Hall approached Human Resources Division Director Rodney Moore at a Warden/Directors

meeting and told Moore that a recent conversation involving yet another supervisee reminded Hall

of a phone call he had received from Secretary Tilley one night at midnight in 2018. [R. 114-2, p.

2].  During their conversation at the meeting, Hall told Moore about how Tilley (during that late-night call in 2018) had put him in contact with the attorney of a woman under supervision and that Tilley said the attorney had information about an officer sexually harassing the attorney's client.  *Id.*  Moore questioned Hall about what officer the attorney had information on, and Hall told Moore that it was Tyler.  *Id.* at 2–3.  Hall told Moore that the phone call "had slipped [his] mind" because he was traveling the next day and forgot about it when he returned home.  *Id.* at 3.

The letter also describes how Hall contacted Brad Holajter (then Executive Director of the Justice and Public Safety Cabinet) on March 22, 2019, to report that he needed to discuss an incident that he had failed to report previously out of Louisville.  *See* [R. 114-2, p. 3]; *see also* [R. 87, p. 54].  Here, the letter reports that Hall told Holajter that he "dropped the ball" and was very concerned and that he had been leaving for Washington, D.C., and failed to act or follow up on the incident report.  *See* [R. 114-2, p. 3].  According to the letter, when Hall arrived at the Cabinet to self-report the incident, neither the investigator assigned to his case nor Internal Investigations Branch management were in for discussion; therefore, Hall was advised to return on Monday for an interview.  *See id.*  The letter states that, after Hall left the Cabinet, he again contacted Holajter to say he was concerned that he had "failed to act" and "that it may have led to others being victimized."  *Id.*  The letter says Hall said he was trying to be transparent and do the right thing. *Id.*

During his deposition, Hall clarified that the allegations contained in the letter concerning his self-reporting actually related to the first violation discussed in the letter involving S.K.  *See* [R. 87, p. 52].  Hall explained the basis for this belief:

> Reason I believe that is because at this wardens and directors meeting on March 22, as letter states, I got a call from Rebecca Carter, another regional manager, indicating that Griffin Brown, my district supervisor, had been contacted by the Justice Cabinet.  When I checked into it, she -- she mentioned that it was involving

an allegation regarding Ron Tyler.  By this time in March 22, 2019, a whole other set of violations -- sexual harassment violations that you guys are obviously aware of had come to light.  By this time Ron Tyler had already been terminated by myself after being placed on administrative leave while those investigation -- those allegations were investigated.  So once you said Ron Tyler, of course, that name did ring a bell concerning the fact that I fired him recently. . . .

I searched through all of the documents that I had for anything regarding Ron Tyler. Since Dan Goyette's name was mentioned, I searched for anything that I have regarding Dan Goyette, and I found an affidavit that Dan Goyette had e-mailed to me on August the 14th of 2018, about two weeks after it was actually signed.  That was the document I found that prompted me to go and talk with Director Rodney Moore.

*Id.* at 52:9–53:3, 53:5–1.

Hall further acknowledged having contacted Holajter on March 22, 2019, to report an incident that he had information about that he believed was being investigated.  *Id.* at 55:1–3. Specifically, "[t]he incident was the allegations against Ron Tyler that Dan Goyette had reported on August 1, based on the [S.K.] affidavit" Hall had found in his files.  *Id.* at 55:5–7.  Thus, again, Hall's deposition testimony confirms that he had received the affidavit containing S.K.'s allegations against Tyler on August 14, 2018, only two days before J.C.'s complaint was filed and shortly before Hall learned of another allegation involving a woman in Ohio.  *See supra* § II(a)(2); *see also supra* § II(a)(3).

Finally, during his deposition, Hall recognized the import of failing to act: "I realized this was a very serious matter.  And as one of many people involved in the entire scenario, I understood how serious it was to have sexual harassment allegations, and that anybody who plays a role in that, or potentially could have contributed, should be very concerned."  [R. 87, p. 55:14–19].  Hall also testified that, consistent with the letter, he had probably made similar statements when he had self-reported his failure to act in March 2019.  *Id.* at 56:15–19 ("Q  And did you feel that you had failed to act, and it might have led to others being victimized?  A  I think that I probably did say

that, as I stated a moment ago.  Anybody remotely involved should have felt some personal responsibility.").

### 5.   Recission of Hall's Termination Letter

In February 2023, nearly four years after Hall was terminated from his position as Director of the Division of Probation and Parole, Hall and KYDOC reached a settlement agreement (as a culmination of Hall's appeal of that termination decision), whereby KYDOC "agree[d] to void/correct the action reflecting dismissal, effective March 26, 2019, and to enter a new action reflecting that the Appellant [Hall] voluntarily resigned with prejudice from his position as Director of the Division of Probation and Parole effective March 26, 2019."  [R. 115-1, ¶ 1]; *see also* [R. 87, p. 43] (Hall discussing his ongoing appeal at his deposition in April 2021).  The settlement order was accepted by the Kentucky Personnel Board in March 2023.  *See* [R. 115-2].

### II.   Legal Standard

The parties' cross-motions for summary judgment are subject to the standard under Federal Rule of Civil Procedure 56.  *See Ohio St. Univ. v. Redbubble, Inc.*, 989 F.3d 435, 442 (6th Cir. 2021) ("[A] case involving cross-motions for summary judgment requires evaluating each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.") (cleaned up).  Rule 56 provides that summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

When considering a motion for summary judgment, the Court must construe the evidence and draw all reasonable inferences from the underlying facts in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009).  The Court may not "weigh the evidence and determine the

truth of the matter" at the summary judgment stage. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The Court "need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

The initial burden of establishing that no genuine dispute of material fact exists rests with the moving party. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies this burden, the burden then shifts to the nonmoving party to produce "specific facts" showing a "genuine issue" for trial. *Id.* at 324–25. Further, where "a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," the Court may treat the fact as undisputed. Fed. R. Civ. P. 56(e)(2). A fact is "material" if the underlying substantive law identifies the fact as critical. *Anderson*, 477 U.S. at 248. Here, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* A "genuine" issue exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249.

## III. Analysis

Parson's remaining claims under federal and state law are both based on the theory that Hall's actions or inactions as the Director of the Division of Probation and Parole led her to be harmed at the hands of Tyler, her parole officer. *See* [R. 113, p. 26]; *see also* [R. 79, p. 4] ("Plaintiffs bring this case seeking compensatory damages under 42 U.S.C. § 1983 and state law . . . stemming from . . . Hall['s] failure to take action when [he] knew or should have known of Defendant Tyler's sexual abuse."); [R. 79, ¶ 156] (referencing Hall's "firsthand knowledge of Defendant Tyler's patently illegal conduct"); [R. 79, ¶¶ 145–46] (alleging Hall's negligent actions led Parson to be harmed). Parson's and Hall's motions for summary judgment both stand

submitted for review. *See* [R. 114 (Parson's Motion)]; [R. 115 (Hall's Motion)]. In his filings, Hall predominately argues that Parson's claims were untimely filed and that Hall's recent settlement with KYDOC "fundamentally changes" this case and further discredits the substance and admissibility of his termination letter. *See* [R. 115 (Hall's Motion), pp. 1–2]. On the merits, he argues that he is entitled to qualified (official) immunity for Parson's remaining claims.

### a.   Statute of Limitations

Hall renews his argument that Parson's claims are barred by the applicable statutes of limitations. *See* [R. 115, § VII]; *see generally* [R. 107-1, p. 12]. The Court will devote little attention to this argument because it is refuted by the record.

As the Court has explained before, both of Parson's remaining claims are subject to a one-year statute of limitations. *See* [R. 113, pp. 15, 22–23] (citing *Collard v. Ky. Bd. of Nursing*, 896 F.2d 179, 180 (6th Cir. 1990); *Roman Catholic Diocese of Covington v. Secter*, 966 S.W.2d 286, 288 (Ky. Ct. App. 1998)). Setting aside whether any particular accrual or tolling rules apply (as Hall seems to argue in his briefing), and assuming the strictest construction of when the clock began to tick on Parson's claims against Hall as being when Tyler last harmed Parson, Parson's claims were timely filed.[10] *See id.* at 15–18, 22–23.

Hall argues that "Parson testified that Tyler had not contacted nor abused her for several months prior to him being suspended in October 2018," [R. 115 (Hall's Motion), p. 8], but this mischaracterizes the record. Rather, Parson testified that the "big harassment stopped" about six months before Tyler's suspension in October 2018, but that left "just the office -- the office thing" in October 2018. *See* [R. 89, p. 91:5–9]. Parson testified that Tyler hugged and kissed her every time she was in his office, and her last contact in the office with him was right before he was

---

[10] In any regard, any tolling or accrual rule would inure to Parson's benefit.

suspended.  *See id.* at 89:4–9.  Further, Parson testified that Tyler asked her to send him inappropriate photographs, and she sent at least one photograph to Tyler on October 8, 2018, right before Tyler was suspended.  *See id.* at 18.  The initial complaint in this action was filed less than a year later on October 7, 2019.  *See* [R. 1].  Thus, under a direct application of both statutes of limitations, Parson's claims are timely (even if just barely).

The Court reached the same conclusion in its prior Memorandum Opinion and Order entered on February 22, 2023, and Hall has offered no argument or authority that leads the Court to reconsider that result.  *See* [R. 113, p. 23] ("Based on these dates, only Parson's state law claims [not the other Plaintiffs'] survive the one-year statute of limitations in a direct application[.]"); [R. 113, p. 17 n.14] ("But, even if the accrual date of the Plaintiffs' federal claims is when Tyler's underlying abuse occurred, Parson's claims still survive.").  Therefore, the Court finds (again) that Parson's remaining claims were timely filed.  Hall's motion for summary judgment on this ground will be denied.

### b.  Evidentiary Arguments

As mentioned above, Parson's remaining claims allege that Hall's actions or inactions as Director of the Division of Probation and Parole led to her to be harmed by Tyler, her parole officer.  *See* [R. 79, p. 4]; *see also* [R. 113, p. 26].  Both parties argue the import and admissibility of Hall's termination letter.  *See* [R. 114-2]; *see also* [R. 115 (Hall's Motion), p. 2] ("Tilley's letter is the cornerstone of Plaintiff's case.").

Understandably, Hall attempts to undercut the letter by arguing (1) that the Court should not consider it because it was later rescinded by KYDOC, (2) that the Court cannot consider it because it is inadmissible hearsay, and (3) that the Court cannot consider it because Tilley (the author of the letter) is unqualified to offer opinion evidence.  *See* [R. 115, pp. 2–6]; *see also* [R.

117, pp. 3–5]. The first and third of these arguments are unavailing. To begin, that Hall ultimately succeeded, through the give and take of the appellate process, in having his termination letter repealed sheds little light on his actions and inactions in 2018 and 2019. Although Hall may disagree with some of the claims contained in the letter, as outlined above, his deposition testimony confirms many of its factual assertions. KYDOC's recission of the letter does not affect Hall's testimony.

Further, the Court finds Hall's opinion testimony argument more properly raised in a pretrial motion in limine or at trial. *See Indiana Ins. Co. v. Gen. Elec. Co.*, 326 F. Supp. 2d 844, 846 (N.D. Ohio 2004) ("The court has the power to exclude evidence in limine only when evidence is clearly inadmissible on all potential grounds. Unless evidence meets this high standard, evidentiary rulings should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in proper context."); *Victor v. Reynolds*, No. 1:20-CV-13218, 2024 WL 811515, at *3 (E.D. Mich. Feb. 27, 2024) (quoting *Indiana Ins. Co.*, 326 F. Supp. 2d at 846). And in any event, the Court's analysis does not rest on any alleged opinions expressed by Tilley in the letter.

Hall's second argument—that the letter is inadmissible hearsay—merits closer attention. In this context, Hall relies on Federal Rule of Civil Procedure 56(c)(2), which provides: "A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The rule is prospective in nature and guides courts, at the summary judgment stage, not to focus on the admissibility of evidence's *form*, but to instead focus on the admissibility of its *contents*. *See generally Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 424 n.8 (6th Cir. 2021) ("The dissent takes issue with our conclusion that because Wyatt has sufficiently proffered that the hearsay evidence of her co-workers' statements

will be produced in an admissible form, *i.e.*, through their direct testimony, at trial, we can consider what would otherwise be inadmissible hearsay evidence.") (collecting cases); *cf. Bailey v. Floyd Cnty. Bd. of Educ. By & Through Towler*, 106 F.3d 135, 145 (6th Cir. 1997) ("The proffered evidence need not be in admissible *form,* but its *content* must be admissible.") (emphasis in original).

The Sixth Circuit has explained that "parties are not required to submit evidence in a motion for summary judgment in a 'form that would be admissible at trial,'" but "the substance must still comport with the rules of evidence, including the rules on hearsay." *Shazor v. Pro. Transit Mgmt., Ltd.*, 744 F.3d 948, 960 (6th Cir. 2014) (quoting *Celotex,* 477 U.S. at 324). "The objection functions much as an objection at trial, and once the objection is made, the burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated." *Warren v. Hollingsworth Mgmt. Servs., LLC*, No. 22-1064, 2022 WL 18542504, at *2 (6th Cir. Dec. 19, 2022) (order) (quoting Fed. R. Civ. P. 56(c)(2) advisory committee's notes to 2010 amendment) (cleaned up).

To be sure, certain parts of the letter contain multiple layers of hearsay. Whether the whole of the letter would be admissible at trial in its current *form* under any exceptions to the rule against hearsay is a matter the Court reserves decision on for another day. To be clear, the Court is not ruling on the admissibility of the letter at this time, and the parties will be free to file appropriate pretrial motions regarding its admissibility. *See Indiana Ins. Co.*, 326 F. Supp. 2d at 846; *Victor*, 2024 WL 811515, at *3 (citing *Indiana Ins. Co.*, 326 F. Supp. 2d at 846). Even so, the Court notes that the content of certain portions of the letter would likely be admissible as non-hearsay. *See* Fed. R. Evid. 801(d)(2). That is, Hall's statements to other individuals would be admissible should those individuals be called to testify at trial (*e.g.*, Regional Manager Fountain's statement that Hall

became "irate" when Fountain advised him that S.K.'s secret audio recording involving Tyler had been played at S.K.'s hearing).

Still, even without considering the contents of the letter at the present time, the Court finds there is ample evidence in the record regarding Hall's actions or inactions to permit Parson's claims to reach a jury (as will be discussed in more detail below).  Here, the Court specifically looks to the following circumstances Hall testified to in his deposition as well as other record evidence:

- On August 1, 2018, Hall received a late-night phone call from then-Secretary Tilley around 10:00 p.m.  [R. 87, p. 46:15–20].  Tilley explained he had received a phone call from Goyette (with the Louisville Metro Public Defender's Office) regarding a sexual assault allegation by a probation or parole officer against a parolee.  *Id.* at 46–47.  Tilley asked Hall to reschedule a preliminary parole revocation hearing involving the complaining parolee, S.K., that was scheduled for the next day, on August 2, 2018.  *Id.* at 47.

- Hall worked with Goyette to get the hearing rescheduled.  *Id.* at 47–48.  As part of this effort, he directly contacted the administrative law judge, Kim Morris, to get the hearing moved.  *Id.* at 48.  Tilley thanked him for his efforts.  *Id.* at 56–57.  S.K.'s hearing was later held on August 30, 2018.  *Id.* at 44.

- Hall knew the name of the parolee/victim, S.K., but testified that, at the time, he did not know the name of the probation or parole officer accused of misconduct.  *Id* at 50.  He did not inquire who the officer was or do any research to determine the identity of S.K.'s officer.  *Id.*  Instead, Hall "asked that the Louisville Metro Public Defender's Office provide any evidence or documentation they had so that the claim could be investigated."  *Id.* at 50:19–22.  He further testified that he "expected that [he] would be provided with the evidence and documentation that they said they had and was waiting to receive it."  *Id.* at 51:2–4.

- On August 14, 2018, less than two weeks after the late-night call from Tilley and after Hall requested evidence and documentation concerning S.K.'s allegations, Goyette e-mailed Hall the sworn affidavit of S.K. concerning her sexual assault allegations against Tyler.  *Id.* at 53.  The affidavit was dated about two weeks earlier (August 1 or 2, 2018).  *Id.*  Even so, Hall testified that he first "found" the affidavit in his files several months later, around March 22, 2019, after learning his district supervisor had been contacted by the Justice Cabinet asking questions about the Tyler allegations.  *Id.* at 52.

- Neither Hall nor any assistant director referred S.K.'s documented allegations to the Internal Investigations Branch or Justice Cabinet, per protocol. *Id.* at 24–25; 55–56.

- On August 16, 2018, two days after Goyette e-mailed Hall S.K.'s affidavit concerning her sexual assault by Tyler, Hall became aware of another complaint against Tyler. *Id.* at 49. This time, J.C. (again only two weeks after Tilley's late night phone call) "validate[d] [a] sexual harassment allegation against Ron Tyler." *Id.* at 49:10. Hall advised that he received a copy of the complaint, but because he was out of town, Gausepohl looked into the matter. *Id.* at 49–50. Hall testified Gausepohl had contacted the Internal Investigations Branch, who reviewed it, and on August 20, 2018, advised it did not want to open an investigation. *Id.*

- Although Hall testified that he received a copy of J.C.'s complaint, he further testified that he did not recall Gausepohl telling him the name of the probation or parole officer accused of sexual allegations. *Id.* at 51. He also testified he did not inquire who the probation or parole officer was or have a natural curiosity to find out, because: "I trusted that when my assistant director told me he had looked into it, that he had done so." *Id.* at 51:20–22.

- The record contains no documentary evidence of J.C.'s complaint, or that it was forwarded to the Internal Investigations Branch for its review.

- On August 30, 2018, S.K.'s parole revocation hearing was held, and Hall testified he was aware of the hearing. *Id.* at 44:5–8.

- On August 19, 2018 (or September 19, 2018), Hall's division received a complaint from another probationer or parolee in Ohio alleging she had been sexually harassed by Tyler. *Id.* at 58–59. Hall initially believed "there wasn't much substance to the complaint," but VanNostrand, the PREA investigator, wanted to check into it a little bit further. *Id.* at 59:9–11. Ultimately, VanNostrand substantiated the allegations and "identified a few other victims." *Id.* at 59:14–18.

- On October 8, 2018, at Tyler's request, Parson sent a photograph to Tyler, "[r]ight before he got suspended." [R. 89, pp. 18, 89:9]

- On October 10, 2018, Hall placed Tyler on administrative leave. [R. 87, pp. 59–60].

- On January 15, 2019, Hall terminated Tyler's employment. *Id.* at 60.

- On March 22, 2019, after hearing that the Justice Cabinet had contacted his district supervisor and was further investigating the allegations into Tyler, Hall "found" the S.K. affidavit Goyette had e-mailed to him seven months earlier on August 14, 2018. *Id.* at 52:9–53:12.

- On March 22, 2019, Hall "self-report[ed]" his failure to act to both Human Resources Division Director Moore and Executive Director Holajter. *Id.* at 51–56. He explained that he just found the S.K. affidavit in his files and realized the import of his delay:

> Q  Did you state that [you] dropped the ball and were very concerned?
>
> A  Yes.  I realized this was a very serious matter.  And as one of many people involved in the entire scenario, I understood how serious it was to have sexual harassment allegations, and that anybody who plays a role in that, or potentially could have contributed, should be very concerned.

*Id.* at 55:12–19.

- Hall further testified that, consistent with his termination letter, he probably made a similar statement when he self-reported in March 2019:

> Q  And did you feel that you had failed to act, and it might have led to others being victimized?
>
> A  I think that I probably did say that, as I stated a moment ago.  Anybody remotely involved should have felt some personal responsibility.

*Id.* at 56:15–19.

As mentioned, Hall contested other portions of the letter, such as the allegation that he became "irate" after learning the secret recording between S.K. and Tyler was played at S.K.'s August 30, 2018 hearing.  Although the Court does not consider these assertions when determining whether a genuine dispute of material fact exists on the present record, as discussed, such content *could* be admissible at trial if, for example, Fountain were called to testify.  *See generally* Fed. R. Evid. 801(d)(2); *Wyatt*, 999 F.3d at 424 n.8 ("Thus, the advisory committee's commentary for Rule 56 as well as Supreme Court and Sixth Circuit precedent support our conclusion that courts, in determining whether to consider hearsay evidence, may inquire as to whether the party opposing summary judgment is capable of producing an otherwise inadmissible hearsay statement in a form that will be admissible at trial, *i.e.*, via substituted oral testimony by the third-party declarant.").

Even so, because genuine disputes of material fact exist without considering the disputed parts of the letter, the Court's analysis does not include or consider those disputed contents.

### c. Parson's § 1983 Claim – Qualified Immunity

Under Supreme Court precedents, "officers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." *D.C. v. Wesby*, 583 U.S. 48, 62–63 (2018) (internal quotation marks omitted); *see also Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) ("We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."). The Court may address the prongs in either order, *see Tolan v. Cotton*, 572 U.S. 650, 656 (2014), and Parson, as plaintiff, bears the burden of overcoming Hall's assertion of qualified immunity, *see Essex v. County of Livingston*, 518 F. App'x 351, 357 (6th Cir. 2013).

### 1. Clearly Established Prong

The Court will address the "clearly established" prong first and observes that, when a supervisory liability claim (as Parson alleges against Hall) is involved, "the second prong of the qualified immunity analysis must be directed at the subordinate's conduct, not the supervisor's." *Penman v. Correct Care Sols.*, No. 5:18-CV-58-TBR, 2018 WL 6220921, at *8 n.1 (W.D. Ky. Nov. 28, 2018). "In other words, it is whether the constitutional right the subordinate violated was clearly established—not whether the supervisor violated a clearly established right." *Id.* (citing *Peatross v. City of Memphis*, 818 F.3d 233, 245 (6th Cir. 2016)); *see also Gray v. Shelby Cnty.*, No. 22-5542, 2023 WL 5237373, at *8 (6th Cir. Aug. 15, 2023) ("As in ordinary § 1983 cases, to overcome a claim of qualified immunity, a plaintiff must show that the supervisor's own behavior

violated her constitutional rights.  But the doctrine is modified at the clearly established prong.  A plaintiff 'need only show that the right that [the subordinate] violated was clearly established at the time of the violation.'") (citing *Peatross*, 818 F.3d at 245).

In this case, the right to bodily integrity and the right to not be subjected to sexual assault at the hands of a government official are clearly established.  *See Sexton v. Cernuto*, 18 F.4th 177, 193 (6th Cir. 2021) ("Here, any reasonable supervisor would be aware that a probationer is entitled to be free from sexual assault and that facilitating the assault or failing to stop such an assault would contribute to a violation of clearly established rights.").  Hall fails to address this prong, conceding the issue.  *See* [R. 115]; *see also* [R. 117].  The other prong, then, of the qualified immunity analysis—whether a constitutional violation occurred—becomes the predominant consideration for Parson's § 1983 claim.

## 2.  Violation of Constitutional Rights Prong

Parson's § 1983 claim is based on her right to be free from sexual assault at the hands of a state actor under the Due Process Clause of the Fourteenth Amendment.  *See* [R. 113, p. 14].  As just discussed, this is a clearly established right.  *See supra* § III(c)(1).  Notably, Parson does not allege that Hall directly sexually assaulted her, but instead alleges that his actions or inactions as Director of the Division of Probation and Parole (for failing to follow and enforce policy related to reports of sexual abuse and for failing to fulfill his obligations to make referrals for investigations of such claims) caused her to be harmed by Tyler, her parole officer.  *See, e.g.*, [R. 79, ¶ 156] ("Defendant Hall . . . approved or knowingly acquiesced to the clearly unconstitutional actions and conduct of employee Defendant Tyler, and acted with deliberate indifference to the rights of . . . Parson, and the offending acts perpetrated against [her] by Defendant Tyler."); [R. 79, p. 3] ("Defendant Hall not only refused to report, but concealed known allegations of sexual

harassment and abuse. As the Director of DPP, he intentionally and with forethought acted to prevent exculpatory evidence of Defendant Ron Tyler's ('Tyler') conduct from being presented in official court proceedings."); [R. 79, ¶ 86] ("If Defendant Hall had taken appropriate action and initiated an investigation of Defendant Tyler when he learned of the sexual harassment complaints against Defendant Tyler, Defendant Tyler would have been placed on administrative leave earlier and would not have been able to sexually abuse Plaintiff Parson in September and October 2018."). Parson thus relies on a theory of supervisory liability against Hall. *See* [R. 113, p. 14]; *see also* [R. 79, p. 4] ("Defendant Tyler's highest-ranking supervisor and DPP's final policy making authority, Defendant Hall, personally received numerous complaints of sexual misconduct.  Yet Hall failed to take any action, other than to proactively cover-up these complaints when they were brought to his attention."); [R. 79, ¶ 101] ("Defendant Tyler's actions were facilitated by Defendant Hall's actions and inactions related to the known complaints of sexual harassment and sexual assault against Defendant Tyler.").

Several analyses are at play for Parson's supervisory liability claim.  First, to establish liability under § 1983, Parson must show: (1) that she was deprived of a right secured by the Constitution or laws of the United States, and (2) that she was subjected or caused to be subjected to this deprivation by a person acting under color of state law.[11] *See Gregory v. Shelby Cnty.*, 220 F.3d 433, 441 (6th Cir. 2000).  Second, Parson must show (1) active involvement by Hall in the violation of her rights and (2) causation between that involvement and her injury.  *See Crawford v. Tilley*, 15 F.4th 752, 761–62 (6th Cir. 2021).

Courts have combined these two inquiries into three elements that a plaintiff proceeding on a theory of supervisory liability must show: (1) unconstitutional conduct by the subordinate;

---

[11] The parties do not dispute the "color of state law" element.

(2) "active unconstitutional behavior" by the supervisor; and (3) a "causal connection between the defendant's wrongful conduct and the violation alleged."[12] *Penman*, 2018 WL 6220921, at *5 (citing *McQueen v. Beecher Cmty. Sch.*, 433 F.3d 460, 470 (6th Cir. 2006); *Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999); *Peatross*, 818 F.3d at 241); *cf. Crawford*, 15 F.4th at 761 ("So, on top of the deliberate indifference standard, Dawn's complaint must also meet the requirements of supervisory liability in § 1983 cases.  Supervisory liability comprises two concepts important here: active involvement by the supervisor and causation.").

Regarding "active" involvement, "[g]overnment officials may not be held liable for the unconstitutional conduct of their subordinates under the theory of *respondeat superior*." *Peatross*, 818 F.3d at 241 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)).  "In other words, a supervisor cannot be held liable simply because he or she was charged with overseeing a subordinate who violated the constitutional rights of another." *Id.*  "Consequently, a mere failure to act will not suffice to establish supervisory liability," *id.*, and neither will negligence or recklessness, *see Crawford*, 15 F.4th at 761.  Still, "'active' behavior does not mean 'active' in the sense that the supervisor must have physically put his hands on the injured party or even physically been present at the time of the constitutional violation." *Peatross*, 818 F.3d at 242.

A plaintiff can show active involvement through a variety of ways.  For example, a plaintiff can show that "a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate." *Crawford*, 15 F.4th at 761 (cleaned up); *see also Taylor v. Mich. Dep't of Corr.*, 69 F.3d 76, 81 (6th Cir. 1995) (same).  Supervisory liability has also been found when the supervisor " abandon[ed] the specific duties of his position . . . in the face of actual knowledge of a breakdown in the proper workings of the

---

[12] The unconstitutional conduct of Tyler is not disputed, as the record establishes that he sexually assaulted offenders under his supervision, including Parson.  *See supra* n.8.

department," or in other words, that the supervisor "personally had a job to do, and that he did not do it." *See Taylor*, 69 F.3d at 81 ("Foltz is not merely a supervisor, but is the official directly responsible both for transfers and for adopting reasonable transfer procedures."); *see also Young v. Campbell Cnty.*, 846 F. App'x 314, 324–25 (6th Cir. 2021) (quoting *Taylor*, 69 F.3d at 81) ("When a jail official is alleged to be personally responsible for a specific duty that the officer delegates, we must determine whether the supervisor 'abandon[s] the specific duties of his position . . . in the face of actual knowledge of a breakdown in the proper workings of the [jail].'").

Regarding the element of causation, courts have explained that "where an official's execution of his or her job function causes injury to the plaintiff, the official may be liable under the supervisory-liability theory." *Peatross*, 818 F.3d at 242. Here, "[t]he challenged conduct must be both a cause in fact and a proximate cause of the alleged injury." *Crawford*, 15 F.4th at 762 (defining both types of causation).

Hall's cursory qualified immunity arguments first rehash his erroneous claim that Tyler's harassment of Parson ended months before Tyler's suspension in October 2018. *See* [R. 115, p. 8]. Next, Hall repeats his objections concerning his termination letter. *See id.* Then, moving to the merits of Parson's § 1983 claim, Hall argues that, even crediting the allegations in his termination letter, the record reflects that he played no more than a "passive role" in Parson's harm. *See id.* at 8–9. He argues that, "[a]t most, the undisputed record before the Court shows a breakdown in communication and mistaken assumptions concerning what was being conveyed, how it was being conveyed, and by whom." [R. 115, p. 9]; *see also* [R. 117, p. 3] ("Hall has testified about why he acted as he did – he relied upon the internal investigative apparatus in DOC to determine whether the claims against Tyler were founded[.]"). Hall also argues that the KYDOC's policies (CPP 3.22 and CPP 14.7) are inapplicable because his own deposition

- 29 -

testimony establishes that KYDOC took actions to further investigate and substantiate claims.  *See* [R. 117, pp. 6–8].   However, as explained below, the record contains evidence on which a reasonable juror could find that Hall had a more active role relating to Tyler's abuse.

## A.  Active Unconstitutional Behavior

Case law suggests several ways that a plaintiff can prove the "active involvement" element for a supervisory liability claim.  For example, a plaintiff can show that "a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate."  *Crawford*, 15 F.4th at 761 (cleaned up).  A plaintiff can also show that a supervisor abandoned the specific duties of his position and such actions or inactions caused plaintiff's injuries, or, in other words, that the supervisor "personally had a job to do, and that he did not do it."  *See Taylor*, 69 F.3d at 81.  On this record, Parson has demonstrated genuine disputes of material fact under both theories.

***Implicit Authorization, Approval, or Knowing Acquiescence.***  The Court first considers the evidence regarding whether Hall "at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of [Tyler]," by failing to report known allegations of Tyler's sexual assaults and by failing to make referrals so that such claims could be investigated. *See Crawford*, 15 F.4th at 761 (cleaned up).  As outlined above, Hall testified that he was contacted by then-Secretary Tilley late in the evening on August 1, 2018, with information concerning a woman under supervision (S.K.) who claimed her probation and parole officer had sexually assaulted her.  *See* [R. 87, p. 46].  At Tilley's request, Hall called the administrative law judge to get S.K.'s hearing, scheduled for the following day, moved to August 30, 2018.  *See id.* at 50. And although he knew S.K.'s name, Hall did not even ask (or research) the name of the officer accused of sexual misconduct.  *See id.* at 50–51.  Instead, Hall "asked that the Louisville Metro

Public Defender's Office provide any evidence or documentation they had so that the claim could be investigated." *Id.* at 50:19–22. Hall further testified that he "expected that [he] would be provided with the evidence and documentation that they said they had and was waiting to receive it." *Id.* at 51:2–4.

Just two weeks later, Hall *was provided* with such documentation when Goyette (with the Louisville Metro Public Defender's Office) e-mailed him S.K.'s affidavit on August 14, 2018. *See id.* at 50, 53. However, Hall testified he only "found" the affidavit in his files nearly seven months later in March 2019 upon learning that one of his district supervisors was contacted by the Justice Cabinet concerning allegations against Tyler. *Id.* at 52–53. S.K.'s allegations were never referred for a formal investigation.

On August 16, 2018, just two days after receiving S.K.'s affidavit documenting sexual allegations against Tyler, Hall learned of J.C.'s allegations. *Id.* at 49. Hall testified that Gausepohl looked into the matter because he, Hall, was out of town. Per Hall, Gausepohl contacted the Internal Investigations Branch, which advised that it did not want to open an investigation after looking into the matter. *Id.* at 49–50. Once again, and by his own testimony, Hall did not even inquire as to the officer involved, although he testified he received a copy of the complaint (which ostensibly would have named the officer). *See id.* at 51. Hall claimed he "trusted that when [his] assistant director told [him] he had looked into it, that he had done so." *Id.* at 51:20–21. The record provides no documentary evidence that J.C.'s complaint was ever written up or that it was referred for a formal investigation.

Again, Hall's testimony confirms that his receipt of J.C.'s complaint was just two weeks after Tilley's late-night call regarding S.K.'s allegations, which had led Hall to get S.K.'s hearing moved to August 30, 2018. And, as mentioned, J.C.'s allegations came only two days after Hall

received S.K.'s affidavit—the "evidence or documentation" that Hall "was waiting to receive" so that "the claim could be investigated." *Id.* at 50:19–20, 51:2–4. Even so, Hall testified he had no knowledge that either of these claims involved Tyler until additional allegations were made in the coming days and weeks. *Id.* at 58–59. Consequently, he failed to link S.K.'s or J.C.'s allegations to Tyler or to each other.

Meanwhile, S.K.'s revocation hearing was held on August 30, 2018, and Hall testified he was aware of the hearing. *Id.* at 44:5–8. And during this compressed timeframe, Hall became aware of additional allegations concerning Tyler. On August 19, 2018 (or September 19, 2018, the record is unclear), Hall's division received another complaint out of Ohio, involving a probationer or parolee who had been sexually harassed by Tyler. *Id.* at 58–59. Investigator VanNostrand ultimately substantiated the allegations and found more victims. *Id.* at 59. On October 10, 2018, Hall placed Tyler on administrative leave, and on January 15, 2019, Hall terminated Tyler's employment. *Id.* at 59–61.

This evidence, when viewed in the light most favorable to Parson, provides evidence on which a reasonable juror could find that Hall was notified of serial allegations in a compressed period of time (indeed, within a matter of weeks) that Tyler, a probation and parole officer under Hall's charge, was accused of sexually abusing women under Tyler's supervision. Indeed, at a minimum, a reasonable juror could find that Hall "at least implicitly authorized, approved or knowingly acquiesced" in Tyler's unconstitutional conduct, or worse, attempted to conceal such allegations involving Tyler by intervening and contacting the judge to get S.K.'s hearing moved; by not acting on S.K.'s affidavit after he had specifically requested confirming evidence; by claiming he only "found" the affidavit seven months later; by allegedly not even inquiring as to what officer was involved concerning J.C's complaint (even though it came to light just two days

- 32 -

after Hall received the S.K. affidavit); and further by failing to ensure (as with S.K.) that a proper referral was made so J.C.'s claims would be properly investigated. *See Crawford*, 15 F.4th at 761 (cleaned up); *see also* [R. 114-4, p. 3] (CPP 3.22 § II) ("The Department of Corrections has a zero tolerance policy toward sexual offenses. . . . Complaints of sexual offenses shall be investigated in a prompt, effective and uniform manner."); [R. 114-5, p. 8] (CPP 14.7 § II(G)(1)) ("If at any time it is learned that an offender is subject to a substantial risk of imminent sexual abuse, immediate action shall be taken to protect the offender."); [R. 87, pp. 24–25] (Hall discussing the division's reporting structure for sexual harassment and abuse allegations).

Although Hall testified he was not aware of Tyler's wrongdoing until mid-September 2018, other evidence suggests he knew Tyler's identity several weeks earlier and did nothing to intervene or prevent additional assaults. A reasonable juror could conclude that Hall knew of Tyler's involvement by August 1, 2018, when then-Secretary Tilley called him late at night to intervene concerning S.K.'s hearing the next day. Or certainly a reasonable juror could find that by August 14, 2018, Hall knew the officer involved was Tyler, when Goyette (with the Louisville Metro Public Defender's Office) e-mailed Hall S.K.'s affidavit.

Similarly, a reasonable juror could discredit Hall's testimony that he was not aware that Tyler was the officer involved in J.C.'s allegations or that he "trusted that when [his] assistant director [Gausepohl] told [him] he had looked into it, that he had done so." [R. 87, p. 51:20–21]. After all, Hall also testified he received a copy of J.C.'s complaint, which ostensibly would have contained the name of the officer involved. And, as outlined above, the timing of J.C.'s complaint, just two weeks after Tilley's late-night call to Hall concerning S.K. and just two days after Hall received S.K.'s affidavit, could lead a reasonable juror to question Hall's claimed ignorance of the officer involved. Although Hall testified he only "found" S.K.'s affidavit seven months later on

March 22, 2019 (after learning that the Justice Cabinet had called Hall's district supervisor inquiring about the Tyler allegations), the record contains evidence on which a reasonable juror could discredit such testimony as outlined above.

Further, Hall's seven-month delay in discovering the S.K. affidavit is undercut by the condensed timing and persistent allegations related to Tyler in late summer 2018, and Hall's direct involvement therein.  Recall that Hall also testified he was aware of S.K.'s hearing that ultimately occurred on August 30, 2018.  Moreover, Hall testified he first became aware that Tyler was accused of wrongdoing in mid-September 2018 (giving Hall the benefit of the doubt on timing), with the allegation out of Ohio involving Tyler. Ultimately, Hall placed Tyler on administrative leave on October 10, 2018, and terminated him on January 15, 2019.  Given the swirling and persistent allegations in August and September 2018 that one or more probation officers were being accused of sexual assault, Hall's direct involvement by moving the S.K. hearing and referring the J.C. allegation to Gausepohl to look in to, his involvement in the Ohio allegation, and his direct involvement in suspending and ultimately terminating Tyler, a reasonable juror could find that Hall's failure to "find" the S.K. affidavit until March 2019 and his failure to link S.K.'s and J.C.'s allegations to Tyler (or to each other), was not the kind of "passive" conduct on which a supervisory official cannot be held liable, but rather, demonstrates Hall "at least implicitly authorized, approved or knowingly acquiesced" to Tyler's unconstitutional conduct.  *See Crawford*, 15 F.4th at 761 (cleaned up).

Also notable in this context is Hall's testimony that he had investigated a subordinate's misconduct in a previous supervisory role, which suggests he knew the proper procedure to follow and did not take a similar approach in late summer 2018 when the allegations against Tyler came to light.  *See* [R. 87, pp. 15–17].  When viewing the evidence in a light most favorable to Parson,

a reasonable juror might question why Hall did not act in relation to the allegations he received in August 2018 (for example, by not even inquiring into which officer was involved), given his own testimony that he knew how to handle such allegations in the past.

Hall was asked about the import of his handling of S.K.'s affidavit and other matters. He testified that he recognized in March 2019 that he had failed to act on S.K.'s affidavit, which "was a very serious matter." *See id.* at 55:14–15. He testified: "And as one of many people involved in the entire scenario, I understood how serious it was to have sexual harassment allegations, and that anybody who plays a role in that, or potentially could have contributed, should be very concerned." *Id.* at 55:15–19. When asked, and consistent with his termination letter, he also reflected on the potential impact this failure had on later victims:

> Q   And did you feel that you had failed to act, and it might have led to others being victimized?
>
> A   I think that I probably did say that, as I stated a moment ago. Anybody remotely involved should have felt some personal responsibility.

*Id.* at 56:15–19.

In such a posture, genuine disputes of material fact exist regarding whether Hall played an active role in Tyler's abuse of Parson—whether by failing to enforce and follow policy, by ignoring (or covering up) allegations about Tyler, by failing to initiate investigations and referrals in response to such allegations, and by intervening in S.K.'s hearing, including by contacting the administrative law judge to get the hearing moved. *See Crawford*, 15 F.4th at 767 ("Supervisory liability is generally limited to times when the supervisor had existing knowledge of the specific type of conduct that led to a plaintiff's injuries."); *see also Gray*, 2023 WL 5237373, at *8 (discussing "implicitly authorized, approved, or knowingly acquiesced" theory on a motion for summary judgment and collecting cases).

***Abandonment of Duties.***  The Court next considers the evidence regarding whether Hall abandoned the specific duties of his position.  Stated another way, the Court considers whether Hall "personally had a job to do, and [] he did not do it." *See Taylor*, 69 F.3d at 81.  In the context of this theory, it is important to remember that Hall was the *Director* of the Division of Probation and Parole, and he testified that, in such role, he was subject to sexual harassment policies.  *See* [R. 87, p. 21].  He also testified that when sexual harassment or abuse allegations were made, they would be reported up the chain of command to him, and that either he or an assistant director would be responsible for referring those complaints for investigations.  *See id.* at 24–25.  Thus, like the warden sued in *Taylor*, Hall was "not merely a supervisor," he was "the official directly responsible" to refer complaints for proper investigation.  *See Taylor*, 69 F.3d at 81.

*Taylor* involved a small-statured and young-looking inmate who was raped after being transferred to a different institution.  *See id.* at 78.  Relevant here, the plaintiff sued the warden alleging an Eighth Amendment violation, arguing that the warden "knew about the risk of sexual assault in the camp program to small, vulnerable-looking prisoners such as plaintiff and neither had a policy to identify and screen out those potential transferees who would not be safe in the camp nor created guidelines for prison staff to follow when screening inmates for transfer." *Id.* at 77.  Recognizing that the warden was "not merely a supervisor, but [wa]s the official directly responsible both for transfers and for adopting reasonable transfer procedures," the Sixth Circuit found the prisoner had produced sufficient evidence to create jury questions on (1) whether the warden knew that conditions throughout the Michigan prison system and particularly at the camp where the plaintiff was raped posed a substantial risk of serious harm to prisoners like plaintiff; (2) whether the warden knew that there was effectively no procedure in place to protect vulnerable inmates from being transferred to dangerous conditions; and (3) whether in the face of this

knowledge, the warden acted with deliberate indifference—that is, disregarded a risk of harm of which he was aware—by failing to adopt reasonable policies to protect inmates like the plaintiff. *See id.* at 77, 81.

In this case, the record contains evidence upon which a reasonable juror could find Hall abandoned the specific duties of his position, meaning that he had a job to do—by enforcing and following policy and by referring allegations of sexual misconduct for investigation—and he failed to perform his job.  As explained above, the evidence suggests that Hall was notified of serial, persistent, and serious allegations against Tyler in August and September 2018. The record also indicates Hall knew his obligations as Director concerning complaints of sexual assault, including his referral obligations to ensure such claims were investigated, and he did not execute the requirements of his job in the face of his knowledge concerning Tyler.  *See supra* § III(b) (outlining timeline).

Further, regarding J.C.'s complaint, a reasonable juror could disbelieve Hall's purported reliance on Gausepohl's representations that "there was nothing there."  *See* [R. 87, pp. 51:20–22]. Indeed, a reasonable juror could find that Hall knew there was a breakdown in the proper procedures for complaints being referred, given the other evidence that suggests Hall already knew Tyler was involved in the S.K. incident, that he sat on such information, and that he knew Tyler was also involved in the J.C. incident (as he had personally received a copy of J.C.'s complaint). And, even if the evidence does not suggest that Hall knew Tyler was involved at that time, his testimony that he failed to even inquire about the officer's identity, in the face of multiple, serious allegations in a compressed period of time, provides evidence upon which a reasonable juror could find Hall abandoned the specific duties of his position as the Director of the Division of Probation and Parole.  Hall's credibility on these matters will be for the jury to assess.  *Cf. Grassi v. Grassi*,

No. 20-3358, 2021 WL 3355475, at *6 (6th Cir. Aug. 3, 2021) ("But it is for the jury to weigh that evidence and assess credibility; it is not the province of the court.") (citing *Anderson*, 477 U.S. at 255).

Thus, as in *Taylor*, the record presents evidence upon which a reasonable juror could find that Hall, having knowledge about Tyler, had a specific job to do as the Director of the Division of Probation and Parole (*e.g.*, refer complaints for formal investigations) and that he did not do so. *See Taylor*, 69 F.3d at 81 ("In the instant case Foltz is charged with abandoning the specific duties of his position—adopting and implementing an operating procedure that would require a review of the inmate's files before authorizing the transfers—in the face of actual knowledge of a breakdown in the proper workings of the department.  A jury could find on the facts that Foltz personally had a job to do, and that he did not do it.").  To be clear, the Court finds the evidence presents more than an argument that Hall was "aware of alleged harassment, but did not take appropriate action."  *See Poe v. Haydon*, 853 F.2d 418, 429 (6th Cir. 1988).  Instead, a reasonable juror could conclude, based on the evidence discussed above, that Hall abandoned his duties in handling (or not handling) allegations against Tyler.

## B.  Causal Connection

Moving to consideration of causation, Hall argues that none of the allegations that were reported to him concerning Tyler involved Parson and that Parson cannot rely on CPP 14.7 because she never filed a complaint under that policy.  *See* [R. 117, p. 7].  But Hall submits too narrow a reading of causation in this regard, as case law does not require Parson to show that Hall's failure to enforce and follow policy was *specifically in relation* to allegations concerning her.  *See Taylor*, 69 F.3d at 81 (in context of Eighth Amendment supervisory liability claim, discussing how proper inquiry is whether the supervisor "had knowledge about the substantial risk of serious harm to a

particular class of persons, not whether he knew who the particular victim turned out to be"). Instead, case law permits the Court to consider what Hall knew regarding troubling allegations involving Tyler's abuse of other women under Tyler's supervision and when Hall knew such information because Parson belonged to the same class of individuals. *See id.* at 82 ("In 1974, Foltz testified that small, youthful prisoners are especially vulnerable to sexual pressure. Therefore, a reasonable jury could conclude that the information in Taylor's file should have alerted a reviewing official that Taylor belongs to a class that is particularly vulnerable to sexual assault.").

Here, Hall's own deposition testimony potentially places his knowledge about allegations concerning Tyler as early as August 1, 2018. *See* [R. 87, p. 46:16–20] ("The first knowledge I had of Ron Tyler or any such allegation, came to my attention on August 1, 2018. It was around 10:00 p.m. in the evening when I received a phone call from Secretary John Tilley with the Justice and Public Safety Cabinet."). Although Hall testified that he did not know Tyler was the officer involved until several weeks later, a reasonable juror might question why the Director of the Division of Probation and Parole allegedly *did not even inquire* as to what officer was accused of sexually harassing and abusing women under the officer's supervision once he was presented with such allegations. And Hall testified that he again did not inquire what officer was involved when he received J.C.'s complaint only two weeks after his involvement in the S.K. incident and two days after he received S.K.'s affidavit.

Thus, a reasonable juror could find that Hall knew about the troubling allegations involving Tyler by August 1, 2018, which is more than two months before Parson's last documented interactions with Tyler in October 2018 when he harassed her in the office and on October 8, 2018, when she sent him a photograph at his request. *See* [R. 89, pp. 18, 91]. To be sure, a reasonable

juror could certainly find Hall had knowledge by August 14, 2018, when he received S.K.'s affidavit, which was nearly two months before Tyler's last harassment of Parson in October 2018.

Hall's own testimony confirms a potential link between his actions and inactions and the harm to probationers or parolees under Tyler's supervision, like Parson. He testified: "I realized this was a very serious matter. And as one of many people involved in the entire scenario, I understood how serious it was to have sexual harassment allegations, and that anybody who plays a role in that, or potentially could have contributed, should be very concerned." [R. 87, p. 55:14–19]; [R. 87, p. 56:15–19] ("Q  And did you feel that you had failed to act, and it might have led to others being victimized?  A  I think that I probably did say that, as I stated a moment ago. Anybody remotely involved should have felt some personal responsibility."). In this way, Hall's testimony supports Parson's theory of causation, *i.e.*, that Hall's failure to refer allegations of sexual abuse by an officer under his authority for proper investigation or to even inquire as to the officer's name—or worse, acting to conceal Tyler's predatory acts—led her to be harmed by a known threat. The Court finds that genuine disputes of material fact exist regarding causation. *See* [R. 114, p. 3] ("Hall is both the legal cause and proximate cause of Parson's legal and physical and mental injuries by taking no steps to protect Parson in ministerial compliance with CPP 14.7.").[13]

In sum, given the parties' competing interpretations of the record regarding key elements of Parson's § 1983 claim, specifically Hall's active participation and causation, the questions concerning Hall's potential liability are ones the jury should decide. And because genuine issues of material fact exist on whether Hall violated Parson's constitutional rights, Hall's motion for

---

[13] Hall's briefing does not contain any discussion regarding direct or proximate causation. *See* [R. 115]; [R. 117]. The Court has no obligation to craft arguments for Hall that he did not present in his briefing. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones.") (cleaned up).

summary judgment on qualified immunity grounds concerning Parson's § 1983 claim will be denied.

Still, the Court observes that, although certain facts in the record favor Parson's position, the evidence is not so one-sided as to warrant the granting of her motion for summary judgment. *See* [R. 114].   In other words, when viewing the evidence in the light most favorable to *Hall*, genuine disputes of material fact continue to exist concerning, for example, whether (as Hall argues) there simply was a "breakdown in communication and mistaken assumptions concerning what was being conveyed, how it was being conveyed, and by whom." *See* [R. 115, p. 9].  All the genuine factual disputes in this matter, then, are appropriately left for a jury's consideration. *See Epperson v. Res. Healthcare of Am., Inc.*, 566 F. App'x 433, 438–39 (6th Cir. 2014) (reversing district court's grant of summary judgment to defendant and affirming denial of plaintiff's motion for summary judgment, observing that the record did not compel the court "to hold that a reasonable jury could find *only* in plaintiff's favor") (emphasis in original).

### d.  State Law Claim – Qualified Official Immunity

Finally, the Court considers whether Hall is entitled to qualified official immunity under Kentucky law for Parson's negligence claim.[14]  Although similar to qualified immunity for § 1983 claims, the qualified official immunity analysis under Kentucky law involves a slightly different inquiry. *See Penman*, 2018 WL 6220921, at *7 ("[Q]ualified immunity standards are different under Kentucky and federal law.").

---

[14] Parson's negligence claim largely mirrors her § 1983 claim. *See, e.g.*, [R. 79, ¶¶ 145–46] (alleging Hall's negligent actions led Parson to be harmed).  The elements for a negligence claim under Kentucky law are duty, breach, causation, damages. *See Patton v. Bickford*, 529 S.W.3d 717, 729 (Ky. 2016).  As discussed above, a § 1983 claim supervisory liability claim cannot rest on mere negligence. *See Crawford*, 15 F.4th at 761.

In Kentucky, "public officers and employees are entitled to 'qualified official immunity' for negligent conduct when the negligent act or omissions were (1) discretionary acts or functions, that (2) were made in good faith (*i.e.* were not made in 'bad faith'), and (3) were within the scope of the employee's authority." *Rowan Cnty. v. Sloas*, 201 S.W.3d 469, 475 (Ky. 2006), *as corrected* (Sept. 26, 2006) (citing *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001)). "Conversely, no immunity is afforded for the negligent performance or omissions of a ministerial act, or if the officer or employee willfully or maliciously intended to harm the plaintiff or acted with a corrupt motive, *i.e.,* again the 'bad faith' element." *Id.* at 475–76 (citing *Yanero*, 65 S.W.3d at 523). "And once the officer or employee has shown *prima facie* that the act was performed within the scope of his/her discretionary authority, the burden shifts to the plaintiff to establish by direct or circumstantial evidence that the discretionary act was in bad faith." *Id.* at 476 (citing *Yanero*, 65 S.W.3d at 523) (cleaned up). "In all instances, however, there must be a causally related 'violation of a constitutional, statutory, or other clearly established right' of the complainant." *Id.* (citing *Yanero*, 65 S.W.3d at 523).

On this record, the parties predictably dispute whether Hall's actions as Director of the Division of Probation and Parole were discretionary or ministerial as those actions relate to the allegations concerning Tyler, and if discretionary, whether those actions were taken in bad faith.[15] *Compare* [R. 114, p. 3] ("But for Hall's failure of ministerial compliance with established policies CPP 3.22 and 14.7 in August, 2018, Parson would not have been sexually harassed/assaulted by Tyler in September and October, 2018.") (record citations omitted), *with* [R. 115, pp. 10–11] ("In fact, Hall's alleged conduct in this action occurred pursuant to his official discretionary authority, not from failing to enforce policy or protect Parson when he was not given *any* indication that

---

[15] The parties do not dispute that Hall was acting within the scope of his employment.

policy needed enforcement or Parson required protection.  And even if Plaintiff could establish some breached duty to enforce policy or protect her from Tyler, she can offer no evidence that such acts (or omissions) were taken in bad faith.") (emphasis in original).

Kentucky courts have described discretionary acts or functions as "those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment," and ministerial acts or functions as those involving "only obedience to the orders of others, or when the officer's duty is absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts."  *See Sloas*, 201 S.W.3d at 477–78 (quoting *Yanero*, 65 S.W.3d at 522).  Determining whether an official's actions were discretionary or ministerial can be a difficult task, as certain actions can have both discretionary and ministerial elements depending on the facts.  *See Ritchie v. Turner*, 559 S.W.3d 822, 834 (Ky. 2018).

On this record, Hall's argument that his actions were discretionary is persuasive in some regards.  *Cf. id.* at 838 ("The dominant act in cases where the alleged abuse is not actually observed (or otherwise known with reasonable certainty) and an investigation is required to determine reasonable cause is discretionary."); *Sloas*, 201 S.W.3d at 477–79 (collecting cases).  However, the Court need not affirmatively decide the discretionary versus ministerial distinction concerning Hall's actions because, even if his actions are viewed as discretionary in nature, genuine disputes of material fact exist regarding whether Hall acted in "bad faith" in performing those actions.[16]

"Bad faith is the opposite of good faith, and it is *not prompted by an honest mistake* as to one's rights or duties, but by some interested or sinister motive."  *Sloas*, 201 S.W.3d at 483 (quoting Black's Law Dictionary 176 (rev. 4th ed. 1968)) (emphasis in original) (cleaned up).

---

[16] Recall, if Hall's actions were found to be ministerial, qualified official immunity would not apply.  *See Marson v. Thomason*, 438 S.W.3d 292, 296 (Ky. 2014) ("Generally, a governmental employee can be held personally liable for negligently failing to perform or negligently performing a ministerial act.").

"Bad faith can be predicated on a violation of a causally related constitutional, statutory, or other clearly established right which a person in a public employee's position presumptively would have known was afforded to a person in the plaintiff's position, or if the officer or employee willfully or maliciously intended to harm the plaintiff or acted with a corrupt motive." *Id.* at 475 (quoting *Yanero*, 65 S.W.3d at 523) (cleaned up).

In this case, for the reasons discussed above, the record contains evidence upon which a reasonable juror could conclude that Hall acted in bad faith in relation to the allegations concerning Tyler. *Cf. Bryant v. Pulaski Cnty. Det. Ctr.*, 330 S.W.3d 461, 467 (Ky. 2011), *as modified* (Feb. 25, 2011) ("Every person enjoys the established right to be free from assaults, which is supported by the criminalization of certain assaults or the liability that comes from civil assault.  Bishop would certainly be presumed to know—that is know or reasonably should have known—that throwing gas on an open fire when the Appellant was standing nearby could reasonably cause Appellant harm, thus making Bishop's action objectively unreasonable, or in bad faith.").  In particular, the record contains evidence concerning S.K.'s allegations, including Hall's participation to get her hearing moved, his request for documentation regarding her allegations, his receipt of such documentation, and his failure to follow up on such documentation, and concerning J.C.'s allegations, which were also not referred for a formal investigation.  This evidence provides grounds on which a reasonable juror could conclude that Hall intervened to prevent allegations concerning Tyler from coming to light or that he otherwise acted in bad faith in relation to the allegations he received against Tyler.  *See Sloas*, 201 S.W.3d at 485 (explaining that bad faith involves "some implication of self-interest, or a deliberate indifference, or sinister motive, rather than an honest mistake or oversight").

Parson has thus demonstrated genuine disputes of material fact exist regarding whether Hall's actions were taken in bad faith. *See Ritchie*, 559 S.W.3d at 838 n.26 ("An official who conducts an investigation without good faith, for example a perfunctory investigation in an attempt to cover up, is not entitled to immunity even though the act is discretionary."). Still, the evidence is once again not so one-sided as to compel the Court to grant summary judgment in favor of Parson. *See Epperson*, 566 F. App'x at 438–39. Instead, all of these factual issues will be for a jury to determine.

### IV.    Conclusion

Accordingly, for the foregoing reasons, and with the Court being otherwise sufficiently advised,

**IT IS HEREBY ORDERED** as follows:

1. Parson's Motion for Summary Judgment [R. 114] is **DENIED**.

2. Hall's Motion for Summary Judgment [R. 115] is **DENIED**.

3. This matter is **SET** for a Telephonic Conference on **Wednesday, April 3, 2024, at 10:00 a.m.** The purpose of this call is to discuss case scheduling and other pre-trial matters. Counsel shall call 888-363-4735, using access code 9522526. Counsel should call in a few minutes before the conference is scheduled to begin.

This the 6th day of March, 2024.

CLARIA HORN BOOM,
UNITED STATES DISTRICT COURT JUDGE
EASTERN AND WESTERN DISTRICTS OF
KENTUCKY